# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

```
*************************************************************
DAVID POLLACK, Acting Regional Director of      *
Region 29 of the National Labor Relations Board, *
for and on behalf of the NATIONAL LABOR          *
RELATIONS BOARD                                  *
                                                 *
                            Petitioner           *
                                                 *
                                                 *
          v.                                     *
                                                 *
                                                 *
GOLDEN FARM BROOKLYN, INC.                       *
      d/b/a Golden Farm Grocery                  *
                                                 *
                                                 *
                            Respondent           *
                                                 *
*************************************************************
```

CV 14          —CV--          2225

TOWNES, J.

GOLD, M.J.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PETITION FOR PRELIMINARY INJUNCTION
## UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

Emily A. Cabrera
Naoki Fujita


Counsels for Petitioner
National Labor Relations Board
Region 29
Two Metrotech Center, 5th Floor
Brooklyn, New York  11201
(718)330-7713

Richard Griffin
General Counsel

Barry J. Kearney
Associate General Counsel

Judy Katz
Assistant General Counsel

Tara O'Rourke
Acting Regional Attorney

FOR THE EASTERN DISTRICT OF NEW YORK ............................................................ 1

I.      STATEMENT OF THE CASE ............................................................................ 7

II.     SUMMARY OF THE DISPUTE ........................................................................ 8

III.    PROCEDURAL HISTORY ............................................................................... 9

**IV.    STATEMENT OF THE FACTS** .................................................................... 10

A. The NYCC Boycott ...................................................................................... 11

B. Respondent Engages in Surface Bargaining ............................................... 11

*i. The Negotiations* ...................................................................................... 11

The First Bargaining Session – November 28, 2012 ............................... 12

The Second Bargaining Session – January 28, 2014 .............................. 12

The Third Bargaining Session – February 13, 2013 ............................... 13

*ii.  Respondent's Final Offer* ........................................................................ 16

***iii. Respondent's Bargaining Notes and Position Statements Establish Its Violations*** ...... 20

C. Respondent's Agent Steve Chun Threatens Employees ............................. 21

*i. Steven Chun's Agency Status* .................................................................. 21

*ii. Threats of futility* .................................................................................... 23

*iii. Threats of termination* ........................................................................... 23

*iv. Instruction that employees should not talk to Union supporters* ........... 24

*v. Promise of benefits for signing the decertification petition* .................. 24

D. Respondent Unlawfully Withdraws Recognition From The Union ............ 25

*1. Respondent's Unfair Labor Practices Taint the Petition* ....................... 26

*2. Respondent did not have objective proof that a majority of the workers no longer supported the Union at the time that Respondent withdrew recognition from the Union* ..... 27

*3.  Respondent assisted in the decertification effort by soliciting signatures for the petition.* .............................................................................................. 28

E. IRREPERABLE HARM TO UNIT EMPLOYEES ...................................... 29

V.    ARGUMENT ................................................................................................. 32

A PRELIMINARY INJUNCTION SHOULD ISSUE TO RESTRAIN RESPONDENT AS THERE IS REASONABLE CAUSE TO BELIEVE THAT RESPONDENT COMMITTED UNFAIR LABOR PRACTICES ..................................................................... 32

A. The Statutory Scheme Under Which Injunctive Relief is Sought ............... 32

B. The Reasonable Cause Standard ................................................................. 33

The Reasonable Cause Standard is Met ........................................................ 35

*A. Surface Bargaining* .................................................................................. 35

1. Respondent Refused to Negotiate Economics Until the Union Convinced NYCC to Stop its Boycott – a Non Mandatory Subject of Bargaining...............................................37

ii. Respondent Did Not Make an Offer on Wages Until Its Final Offer ...........................39

iii. Respondent's Took Several Intractable Positions that Would Predictably Be Repugnant to the Union ...................................................................................................41

    1.   *Proposal that the Employer Select the Shop Steward, Refusal to Discuss Union Access, and Insistence that Respondent Only Deal with the Shop Steward* .................42

    2.   *Refusal to Discuss Union Security and Payroll Deductions* ...................................44

iv. Respondent's Final Offer...........................................................................................44

v. *Respondent's Denials Should Not Be Credited* .........................................................47

vi. *Conclusion Regarding Surface Bargaining* ..............................................................48

B. Respondent Violated Section 8(a)(1) Through its Agent Steve Chun ..................................50

  i. *Steve Chun's Agency Status* ......................................................................................50

  ii. *Respondent Threatened Employees that Supporting the Union was Futile*......................53

  iii. *Respondent Threatened Employees With Termination*............................................54

  iv. *Respondent Instructed Employees not to talk to Union Supporters*...................................55

  v. *Respondent's Denial of the Unlawful Statements Should Not Be Credited.* ...................55

C. Respondent Unlawfully Withdrew Recognition from the Union Twice...............................56

  i. *Respondent's unfair labor practices taint the petition.* ...................................................59

  ii. *Respondent did not have objective proof that employees did not support the Union at the time that it withdrew recognition.* ...............................................................................61

  iii. *Respondent lent more than "ministerial aid" to the decertification effort.*....................63

D. Interim Relief Is Just and Proper ..........................................................................................66

  The Just and Proper Standard is Met ...........................................................................66

VI.    CONCLUSION...............................................................................................................71

## Cases

*A. H. Belo Corp. (WFAA-TV) v. NLRB*, 411 F.2d 959 (5th Cir. 1969)...........................................44

*Advocate South Suburban Hospital*, 346 NLRB 209, 209 fn. 1 (2006),........................................62

*Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir. 1988) ...................34

*Ahearn v. Remington Lodging and Hospitality*, 842 F.Supp.2d 1186, 1204-05 (D. Alaska 2012)..77

*Airtex*, 308 NLRB 1135 fn.2 (1992) ..........................................................................................58

*Allied Chemical and Alkali Workers of America, Local Union No.1 v. Pittsburgh Plate Glass*, 404 US, 157 (1971).............................................................................................................................40

*Armored Transport, Inc.*, 339 NLRB 374 (2003) .......................................................................71

*Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26-27 (1st Cir. 1986).......................................74

*Auciello Iron Works, Inc. v. N.L.R.B.*, 517 U.S. 781, 785-87, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996) ....................................................................................................................................63

*Bagel Bakers Council of Greater New York*, 174 NLRB 622, 630 (1969)...................................49

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001)...................................76, 78

*Borg Warner Corp.*, 128 NLRB 1035, 1051 (1960)....................................................................49

*Brooks v. N.L.R.B.*, 348 U.S. 96, 98-104, 75 S.Ct. 176, 178-82, 99 L.Ed. 125 (1954)...........62, 63

*Bryant & Stratton Business Institute Inc., v. National Labor Relations Board*, 140 F.3d 169 (2nd Cir. 1998) ...........................................................................................................................39, 53

*Cablevision Industries*, 283 NLRB 22, 29 (1987) ................................................................56, 57

*Chelsea Industries*, 331 NLRB 1648 (2000) ..............................................................................69

*Chester County Hospital*, 320 NLRB 604, 622 (1995) ..............................................................47

*CJC Holdings*, 320 NLRB 1041, 1047 (1996) ..........................................................................47

*Cleveland Sales Co.*, 292 NLRB 1151, 1155-1156 (1989)..........................................................49

*Continental Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2nd Cir.1974)............................................37, 51

*Cooke's Landing*, 289 NLRB 1100, fn. 8 (1988) .......................................................................68

*Corrections Corporation of America*, 347 NLRB 632, 633 (2006) .............................................70

*D'Amico v. Townsend Culinary, Inc.*, 22 F.Supp.2d 480, 490–91 (D. Md. 1998) .........................74

*Danielson v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d Cir. 1974).............................................................................................................................34, 36

*Deister Concentrator Co.*, 253 NLRB 358, 359 (1980) ..............................................................49

*Dentech Corp.*, 294 NLRB 924, 925 (1989)...............................................................................57

*Dunbar v. Park Associates, Inc.*, 23 F. Supp.2d 212, 218 (N.D.N.Y. 1998) ................................74

*Equipment Trucking Co.*, Inc., 336 NLRB 277, 283 (2001).......................................................58

*Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 182 (D.C.Cir.2006) ..........................................63

*Frankl v. HTH Corp.*, 650 F.3d 1335, 1363 (9th Cir. 2011).......................................................76

*Glomac Plastics, Inc. v. N.L.R.B.*, 592 F.2d 94, 98 (2d Cir.1979)...............................................38

*Granite Construction Co.*, 330 NLRB 205, 208 (1999) ..............................................................68

*Great American Products*, 312 NLRB 962, 962 (1993) ..............................................................56

*Harding Glass Co.*, 316 NLRB 985, 991 (1995)........................................................................71

*Hearst Corp.*, 281 N.L.R.B. 764 (1986)......................................................................64, 70, 72

*Heritage Nursing Homes*, 296 NLRB 230, 231 ........................................................................59

4

*Hirsch v. Konig*, 895 F.Supp. 688, 697-98 (D. N.J. 1995) .................................................. 78

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369 (2d Cir. 2001) .............................. 74, 75

*Hospitality Motor Inn*, 249 NLRB 1036, 1036 fn. 1 (1980)................................................. 47

*HQM of Bayside, LLC*, 348 NLRB 758, 759 (2006) ........................................................ 68

*In re Whirlpool Corp.*, 337 NLRB 726, 731 (2002) ........................................................ 58

*International Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 212 (D.C.Cir.1995)....................... 55

*Kaynard v. Independent Routemen's Association*, 479 F.2d 1070, 1072 (2d Cir. 1973).............. 36

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980) ............................................. 34, 35, 73

*Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir. 1984)............................................ 33, 73

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980)................................passim

*Lee Lumber and Building Material Corp.*, 306 NLRB 408, 409 (1992) ................................... 70

*Levitz Furniture Company of the Pacific*, 333 NLRB 717 (2001)......................................... 67

<u>*Lloyd A Fry Roofing Co., v. NLRB*, 216 F.2d 273, 275</u> (9th Cir., 1954). ............................. 48

*Local 1814, Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1394................................ 55

*Made 4 Film, Inc.*, 337 NLRB 1152, 1159 (2002)........................................................ 69

*Massey Energy Co.*, 354 NLRB No. 83, slip op. 78 fn. 11 (2009). .................................... 56

*Master Slack Corp.*, 271 NLRB 78, 84 (1984).......................................................... 65

*Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396-97 (E.D. Pa.
2001) ..................................................................................................... 76

*Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980) ........................... 73

*N.L.R.B. v. Insurance Agents' Int'l Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454
(1960)..................................................................................................... 38

*N.L.R.B. v. Wooster Division of Borg-Warner Corporation*, 356 U.S. 342, 349-350 (1958). 39, 49

*NLRB v. A. W. Thompson, Inc.*, 449 F.2d 1333, 1335 (5th Cir. 1971) ................................. 43

*NLRB v. Bagel Bakers Council of Greater New York*, 434 F.2d 884, 888 (2d Cir. 1970)............. 48

*NLRB v. Big Three Industries, Inc.*, 497 F.2d 43 (5th Cir. 1974)....................................... 43

*NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1187 (D.C.Cir.1981) ............................ 37, 41, 51

*NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972)....................... 44

*NLRB v. Johnson Mfg. of Lubbock*, 458 F.2d 453 (5th Cir. 1972)...................................... 44

*NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir. 1953)................................... 43

*NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 609-610 (7th Cir. 1979)................................. 44

*Outboard Marine Corp.*, 307 NLRB 1333, 1335 (1992)................................................ 58

*P.S.K. Supermarkets, Inc.*, 349 NLRB 34, 36 (2007) .................................................... 60

*Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 361 (E.D.N.Y. 2012) ............. 79

*Pittsburgh & New England Trucking Co.*, 249 NLRB 833, 836 (1980)................................... 66

*Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 164 (1st Cir. 1995) ....................................... 77

*Rolligon Corp.*, 254 NLRB 22 (1981) .................................................................... 59

*Roosevelt Memorial Medical Center*, 348 NLRB 1016, 1022 (2006) ................................... 52

*Sans Souci Restaurant*, 235 NLRB 604, 606 (1978) .................................................... 59

*Scott v. Stephen Dunn & Assocs.*, 241 F.3d 651, 669 (9th Cir. 2001).................................. 77

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975)................................ 32, 73, 77

*SFO Good Nite Inn, LLC v NLRB*, 700 F3d 1 (D. C. Cir. 2012)...................................... 64, 65

*SFO Good-Nite Inn*, 357 NLRB No. 16 ............................................................. 72

*Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999)......................... 33, 35

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995)............................................................................................................... 33, 35

*Silverman v. Red & Tan Charters, Inc.*, 1993 WL 404146 (S.D.N.Y. Oct. 6, 1993) ................ 35

*Steinerfilm, Inc.*, 255 NLRB 769 (1981) ........................................................... 59

*Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C.Cir.2001).................................... 58

*Times-Herald, Inc.*, 253 NLRB 524 (1980)......................................................... 70

*United Packinghouse Food & Allied Workers Int'l Union v. NLRB*, 135 U.S.App.D.C. 111, 416 F.2d 1126 (1969) ...................................................................................... 43

*United Technologies*, 296 NLRB 571 (1989)....................................................... 42

*Wycoff Steel, 303 NLRB 517 (1991)* ............................................................... 48

*Zimmerman Plumbing Co.*, 325 NLRB 106, 106 (1997)............................................... 56

## Federal Statutes

29 U.S.C. § 152(13) (1994) ......................................................................... 55

29 U.S.C. § 160(j) (1994) .......................................................................... 32

29 U.S.C. §§ 157, 158(a)(1) (1994) ................................................................. 57

## Other Authorities

(Rest. (3rd) of Agency, §27). ...................................................................... 52

## I. STATEMENT OF THE CASE

This proceeding is before the Court on a petition filed by the Acting Regional Director of Region 29 of the National Labor Relations Board, herein called the Board, pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149, 73 Stat. 544, 29 U.S.C. Sec. 160(j)), herein called the Act.  Section 10(j) of the Act provides that upon issuance of an administrative complaint charging that a person has engaged in or is engaging in an unfair labor practice, the Board may petition the district court "for appropriate temporary relief or a restraining order." *See* 29 U.S.C. § 160(j) (1998).

Petitioner, David Pollack, Acting Regional Director of Region 29 of the Board, brings this petition against Golden Farm Brooklyn, Inc. d/b/a Golden Farm Grocery, herein called Respondent, for, *inter alia*, a preliminary injunction pending the final disposition of the matters involved herein pending before Administrative Law Judge Steven Fish and the Board, based on an Amended Complaint that alleges, *inter alia*, that Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a)(1) and (5) of the Act.

Section 8(a)(1) of the Act makes it unlawful to threaten or otherwise coerce employees because of their union or other protected activities.  Section 8(a)(5) of the Act makes it unlawful for an employer to refuse to bargain in good faith with the collective-bargaining representatives of its employees.

## II. SUMMARY OF THE DISPUTE

Respondent is a 24-hour grocery store located on Church Avenue in the Kensington section of Brooklyn, New York. (Tr. 500, Kim)  Beginning in or around the spring of 2011, there was significant public interest regarding the poor working conditions of Respondent's workforce, which resulted in a community boycott of the store. (Tr. 584, Kim) In or around June 2011, a community group called New York Communities for Change ("NYCC"), assisted Respondent's employees in filing a lawsuit against Respondent alleging that it failed to pay the legal minimum wage to its workers. (GC-37) That suit was ultimately settled for an undisclosed sum. (Tr. 584, Kim)  NYCC contacted Local 338, Retail, Wholesale, and Department Store Union, United Food and Commercial Workers, ("the Union"), to inform them that Respondent's employees might be interested in joining the Union and in having the Union represent them. (Tr. 208) In 2010, the Union began to hold meetings with Respondent's workers to discuss unionization. (Tr. 428, Diaz) The Union filed a petition with Region 29 of the Board, and in May 2012, the NLRB conducted an election amongst Respondent's employees. The Union won that election. After some post-election litigation, on September 20, 2012, the Board certified the Union as the employees' exclusive bargaining representative. (GC-29)[1]

The parties began negotiations for an initial collective bargaining agreement in November 2012. (Tr. 36, LaRuffa) The Petitioner alleges that over the course of the negotiations, Respondent made various threats to its workers, including threats of

---

[1] The Union was certified as the representative of the bargaining Unit consisting of: all full-time and regular part-time employees, including cashiers, clerks, stock persons, drivers, and general merchandise handlers of groceries, meat, fish, and produce, employed by the Employer at its facility located at 329 Church Avenue, Brooklyn, New York; but excluding all managers, buyers, office clerical employees, guards and supervisors as defined in Section 2(11) of the Act.

termination for supporting the Union, and engaged in surface bargaining by, among other things, conditioning bargaining on a permissive subject and refusing to discuss provisions such as union security and dues check off. The parties met once per month until August 2013, for just a few hours each session due to limitations imposed by Respondent's purported travel needs. On August 23, 2013, Respondent gave the Union its "final offer", giving the Union only three days to accept the offer. (Tr. 88 La Ruffa) When the Union failed to accept the offer by Respondent's arbitrarily imposed deadline, Respondent withdrew the offer and refused to meet thereafter. (GC-14) Just a few weeks after the expiration of the certification year, Respondent withdrew recognition from the Union. (GC-15) About one month later, Respondent informed the Union that it was withdrawing recognition yet again, purportedly based on new evidence of loss of employee support for the Union. (GC-16)

### III. PROCEDURAL HISTORY

On August 28, 2013, the Union filed a charge in Case No. 29-CA-112315 alleging that Respondent violated its statutory duty to bargain in good faith by engaging in surface bargaining, in violation of Sections 8(a)(1) and (5) of the Act. On October 16, 2013, the Union filed another charge in Case No. 29-CA-114873 alleging that Respondent unlawfully withdrew recognition from the Union, also in violation of Sections 8(a)(1) and (5) of the Act. On November 26, 2013, the Union filed a charge in Case No. 29-CA-118032, alleging that Respondent again unlawfully withdrew recognition from the Union, in violation of Sections 8(a)(1) and (5) of the Act.

On December 10, 2013, the Regional Director for Region 29 issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, ("the Complaint"),

in the above captioned cases (29-CA-112315, 29-CA-114873, and 29-CA-118032) alleging violations of 8(a)(1) and (5) of the Act.(GC – 1(G)). On December 20, 2013, Respondent filed its Answer to the Complaint. (GC – 1(K)). The case was tried before Administrative Law Judge Steven Fish on January 29 and 30, and February 10 and 11, 2014.

At trial, Counsel for the General Counsel moved to amend the Complaint to include the following allegations: a) that Steve Chun is the Store Manager and agent/supervisor of Respondent, b) that in August and December 2013, Chun threatened employees with termination because of their support for the Union, c) that in December 2013, Chun informed employees that supporting the Union was futile, d) that in November 2013, Chun instructed employees not to speak to other employees who support the Union, and e) that in November 2013, Chun promised employees additional hours of work if they signed a decertification petition. Also at trial, Counsel for the General Counsel moved to amend the Complaint to include the following additional remedies: a) that Respondent bargain on request with the Union within 15 days of any Board Order, b) that Respondent bargain on request for a minimum of 24 hours per week until an agreement or lawful impasse is reached, and c) that Respondent's Manager Sonny Kim be required to read any Notice to employees in English, Spanish, and Korean. (GC-1(M,O), Tr. 11) Judge Fish granted both motions to amend. Respondent, on the record, denied the allegations and asserted that the proposed remedies are inappropriate. (Tr. 12-13)

## IV.    STATEMENT OF THE FACTS[2]

---

[2] All facts were adduced from the official Hearing transcript and Exhibits.

### A. The NYCC Boycott

As noted, on June 9, 2011, NYCC assisted Respondent's employees in filing a suit against Respondent alleging that it had failed to pay the statutory minimum wage to employees. (GC-37) In or around June 2012, NYCC and Respondent reached a settlement wherein Respondent paid an undisclosed sum of money to its employees. (GC-37, Tr. 584, Kim) The working conditions of Respondent's employees, and later the suit filed by these workers, generated significant public interest which resulted in a boycott of the store by NYCC and its supporters, and another community group called Occupy Kensington. Id. The boycott included leafleting, protesting, and some entry into the store by protestors attempting to pay for items with pennies. (Tr. 722, Hong) Although the Union was initially contacted by NYCC about the store, there was no evidence presented at trial that the Union was involved in any way with the community boycotts of the store. Rather, the testimony adduced at trial showed that the Union was not involved with the boycott at all and in fact pleaded with NYCC to stop the boycott. (Tr. 220-221, Caffey) In that regard, although Respondent filed a law suit and a restraining order against NYCC, it did not file any such suit against the Union. (R-10)

### B. Respondent Engages in Surface Bargaining

#### *i. The Negotiations*

The evidence adduced at trial establishes that there is little dispute regarding what went on at the negotiation table. In fact, attorney for Respondent Tom Coleman, who was present for the majority of bargaining sessions, commended Union witness Eric LaRuffa on his "excellent summary of the scope of negotiations." (Tr. 100, Coleman)

Respondent's witnesses and evidence support the Union's version of events, with few exceptions.

### The First Bargaining Session – November 28, 2012

Negotiations for a first contract began on November 28, 2012. (Tr. 36, LaRuffa) The first session took place at the Williamsburg Diner. (Id ) Present for the Union were attorney Eric LaRuffa and Union Director Jack Caffey. Present for Respondent, were manager Sonny Kim and labor consultant Joe Mielechowski. (Tr. 37) The session was more for introductory purposes (Tr. 37) Respondent raised the topic of the boycott during this session, as it would at each and every session thereafter. Id. Respondent's attorney Ron Pfeiffer stated that owner Sonny Kim was upset because the boycotts were going on and they were hurting his business. (Tr. 38) At this first meeting, Respondent's attorney Ron Pfeiffer stated repeatedly that in Kim's view it was the Union that was behind the boycott[3]. (Tr. 210, Caffey) The Union assured Respondent that it had nothing to do with the boycott and that the purpose of the meeting was to put the "bad blood" behind them and move forward. Id. The Union handed Respondent a typical industry contract and the parties discussed some disciplinary issues. (Tr. 38, LaRuffa) The meeting did not last long.

### The Second Bargaining Session – January 28, 2014

The parties met again on or about January 28, 2013, at a Marriott Hotel near LaGuardia airport. (Tr. 41, LaRuffa) Present for Respondent at this meeting were attorney Ron Pfeiffer and labor consultant Joe Mielechowski. Present for the Union were

---

[3] Manager Sonny Kim was present at this first meeting. The Union had a hard time convincing Mr. Kim to even meet with them because Kim mistakenly thought that the Union was behind the boycotts. (Tr. 220, Caffey)

attorney LaRuffa and Director Jack Caffey. (Tr. 41-42) At the outset of this session, the Union gave Respondent the Union's first formal proposal for a contract. (Tr. 42) Respondent then raised the issue of the boycott again. Attorney Pfeiffer stated that Sonny Kim was losing money because of the boycott and he therefore could not deal with economics at the table. (Tr. 44, LaRuffa) Pfeiffer stated that Kim wanted the boycotts to stop and that he did not want to discuss anything. (Tr. 45, La Ruffa) At this session, the Union attempted to discuss the various economic proposals contained in their proposed contract. However, both Joe Mielechowski and Ron Pfeiffer replied that Kim was not even approachable about these issues because of the boycott. (Tr. 45-46, La Ruffa)

The parties also discussed the recognition of the Union, found in paragraph 2(a) of the Union's first proposal. Respondent stated that Sonny did not want to recognize the Union as the employees' representative. (Tr. 46-47, LaRufffa)

The January 28th meeting lasted only 2-3 hours. (Tr. 47, LaRuffa) In fact most sessions lasted just 2-3 hours. Director Caffey testified that Respondent's negotiators always arrived at around 12 noon or 1:00 pm because they came from out of state. The Respondent limited the negotiation sessions to just 2-3 hours because the negotiators had to travel back to their hometowns. (Tr. 212, 215 Caffey) The Union asked the Respondent's representatives to say longer and "bring pajamas" however, Respondent refused. (Tr. 215, Caffey)

### The Third Bargaining Session – February 13, 2013

The parties met again on or about February 13, 2013, at the same Marriott Hotel. The same parties were present with the exception of attorney Ron Pfeiffer, who

13

eventually was replaced by attorney Tom Coleman. (Tr. 47-48, La Ruffa) At the outset of

the meeting, the Union submitted its revised proposal to Respondent, despite not having

received any counter proposal from Respondent.. The parties then reviewed the proposal.

(Tr. 48-49) The parties discussed recognition of the Union. Respondent finally agreed to

recognize the Union as the representative of the employees. The parties also discussed

Union security. However, Respondent stated that it would not agree to Union security

because it did not believe that employees should have to be made members of the Union

(Tr. 49-50) With regard to dues checkoff, Respondent stated that it would not agree to

dues checkoff because it felt that if the Union wanted dues it should get the dues itself

and that Respondent should not have to help the Union with its paperwork. (Tr. 50,

LaRuffa)  With regard to wages, Respondent refused to discuss wages because of the

continuing boycott and the impact of the boycott. (Tr. 50-51)

  With regard to Union Visitation, Respondent told the Union that Kim did not

want any Union representative at the store. (Tr. 51) In this regard, during a discussion

about putting a step in the grievance process prior to arbitration, Respondent refused to

include Union representatives in the grievance process. Respondent would only agree to

meet with the shop steward during any pre-arbitration meetings. (Tr. 52)

Finally,Respondent proposed that Manager Kim select the Union shop steward and that

Kim only ever have to deal with the shop steward on Union matters. (Tr. 51-52) The

Union replied that Kim would not be the individual to appoint the shop steward. It was

firm on the position that it would choose its own shop steward. Id.

  After these first two sessions, the parties met only once per month in March,

April, June, and July 2013. Respondent admitted at trial that at each of these bargaining

sessions, Respondent raised the issue of the boycott and how Respondent refused to discuss economic issues because of it. (Tr. 515-516, Kim).  Respondent also admitted that during these sessions, the parties discussed union security, dues checkoff, union visitation, and shop stewards.  They also admitted that Respondent refused to agree to Union security, dues check off, or union visitation provisions. (Tr. 517, Kim) Respondent also admitted that it only wanted to deal with the shop steward that it selected during the grievance process, and not any Union representative. (Tr. 518, Kim) In this regard, Manager Sonny Kim testified that he was opposed to having a Union official in his store because, "I don't want outsiders come in my store disturbing business." (Id.)

With regard to dues check off, labor consultant Joe Mielechowski testified that Kim "did not want to be responsible for administrating and doing the paperwork…He did not feel it was his responsibility and he felt that that should be shouldered by the Union." (Tr. 153) With regard to Union security, Mielechowski testified that, "His position was similar. He was aware that half of his workforce did not want nothing (sic) to do with the Union and he did not feel that it was his responsibility that if somebody was not meeting their financial obligation to the Union that it was on him to terminate them….He was not going to force people to join the Union, he didn't think that was right." (Tr. 153-154) Mielechwski testified that Kim knew that the workers did not support the Union because of the "vote count." (Tr. 182) Manager Kim's testimony added additional reasons for the rejection of the union security clause. He testified that he did not want a union shop provision, "Because I was afraid that they would like boycott again and also, I feel that I was losing business at that time too." (Tr. 517, Kim)

With regard to wages, labor consultant Mielechowski testified that, "Well, throughout the negotiations, as I was saying earlier, the picketing and that type of activity was having an impact on [Kim's] business. And there was a lot of uncertainty with what he should expect economically, I guess what his business would generate economically because of the activity that was happening at his function (sic) and he was not -- he did not have no confidence that that was going to come to an end…it was discussed at every session." (Tr. 154)

The only economic proposals, if they can be described as that, were not made by Respondent until the June 3, 2013, session.[4] (Tr. 135, 137 LaRuffa, GC-12) Respondent proposed that after one year of employment, employees would receive one paid holiday, after three years of employment, employees would receive five vacation days, and that all employees employed for three years or more would receive one sick day per year. (GC-12)

### ii. Respondent's Final Offer

The parties' final negotiation session was held via conference call on August 23, 2013. (Tr. 75, LaRuffa) Present on the line for Respondent were consultant Joe Mielechowski and attorney Tom Coleman.  Present for the Union were attorney Eric LaRuffa, Director Jack Caffey, and employee Jesus Rios. (Tr. 75, LaRuffa) At the outset of the session, the Union provided Respondent with a revised and updated proposal that reflected the parties' agreement and lack of agreement up to that point. (Tr. 76, LaRuffa) Up to that point the parties had agreement on the following items only:

---

[4] There is some evidence in Respondent's bargaining notes (GC-17-27) that these proposals may have been made at an earlier session. However, Respondent's witnesses did not testify to this and it is not clear from the documentation whether Respondent actually gave these proposals across the table prior to the June 3 session. Thus, the only testimony on this issue came from LaRuffa.

- Article 1(a)(b)(c)(e)and (f) only- Definition and Coverage
- Article 2(a) only- Union Recognition and Union Shop
- Article 3(a)-(d)- Probationary Period and Tenure of Employment
- Article 4- Hours of Work
- Article 6- Overtime Pay
- Article 9- Management Rights
- Article 10- Individual Agreements
- Article 13- Shop Stewards
- Article 14- Benefit Returns
- Article 16- Funeral Leave
- Article 17- Leave of Absence
- Article 18- Arbitration- except the issue of what the shop steward's role would be
- Article 19- Severability

As of the August conference call, the parties did not have agreement on any economic terms. Respondent had only just made offers on vacation and sick leave during the June 3, 2013 session, but there was no agreement. (GC- 12)

The parties discussed the updated proposal. The negotiators commented that it was still difficult dealing with Kim in connection with the negotiations. The parties then caucused and Jack Caffey got called away. Eric LaRuffa was the only Union representative that came back on the line after the caucus. When LaRuffa got back on the line, Tom Coleman stated that Respondent had an offer to convey. Coleman stated that Respondent would agree to a four month contract only. (Tr. 88) LaRuffa testified that Coleman asserted that all of Respondent's proposals given up to that point would remain the same. Id. LaRuffa later clarified that he understood the offer to mean that the contract would contain everything the parties had agreed to up to that point. The issues that remained open "were still open." (Tr. 136) LaRuffa testified that Respondent's offer also required an agreement by the Union that it would prevent any third party from engaging in any boycott or picket against the store. As will be discussed, although Mielechowski denied that Coleman said this, Coleman never denied making this statement.

In addition, the evidence establishes that neither Coleman nor Mielechowski had the authority to enter into an agreement on Respondent's behalf. In that regard, Coleman stated that neither he nor Mielechowski necessarily had Kim's "okay" on the proposal but if the Union agreed to it, they would go back and try to get Kim to agree. (Tr. 89) Coleman did not deny this and Mielechowski admitted to this in his testimony set forth below.

During re-cross examination LaRuffa pointedly told attorney Coleman, "And in that proposal, I didn't know what it was going to contain except what you had stated to me verbally, which was something about a raise, perhaps; some issue over agreeing to somehow refrain other entities from boycotting or picketing the store..." (Tr. 139) LaRuffa testified that the offer regarding a raise was the first wage proposal Respondent had made. (Tr. 136)

The evidence establishes that Respondent instituted a very short deadline on its final offer. Respondent told LaRuffa that the Union had to accept the proposal by 11:59 p.m. the following Monday. LaRuffa responded that he did not think the offer would "fly too well" with Director Caffey but that he would take it back to him. LaRuffa specifically asked Respondent to put the offer in writing so he could discuss it with Caffey. (Tr. 89)

Respondent's account of its final offer was similar, corroborating that Respondent's representatives had no authority to agree to any terms. Consultant Mielechowski testified that:

> "It may have came from Tom. I don't know if it was actually me or Tom. It may have been Tom presented to Eric was that the 50 cents an hour would kick in immediately. We did explain to Eric or Tom did explain to Eric that we did not have this discussion with Sonny prior, but we felt that with our strong support and urgence (sic) with this that he would

back that. And in addition to the 50 cents an hour, everything that we already agreed upon was still on that table."
(Tr. 157, Mielechowski)

Immediately following the conference call, LaRuffa engaged in an email exchange with Mielechowski. (Tr. 90, LaRuffa) In the first email, sent shortly after the conference call ended on August 23rd, LaRuffa asked for the "tentative" proposal that Mielechowski had agreed to send, and then LaRuffa suggested that the parties meet in person or via conference on 8/28, 8/30, or 9/6. On the following day, August 24th, Mielechowski sent LaRuffa a response. With regard to the additional meetings, Mielechowski inexplicably replied, "Based on your email regarding scheduling additional meetings after I send you the proposal that we discussed yesterday, in writing, it appears that the Union has already rejected it." (GC-14) Mielechowski then asked LaRuffa to let him know whether this was the case because if it was, he was not going to put the offer in writing. Mielechowski then wrote, "Unless the union is willing to agree to our last offer, there appears little point in further meetings." Id. On Tuesday, August 27, at 8:30 am, LaRuffa replied "Yes, send your proposal." Mielechowski then replied that the deadline had passed and he would not be sending the Union the proposal. (Id.) There were no further meetings or conversations after this.

The Respondent did not deny conditioning agreement on the guarantee of no third party boycotts or that the contract was for four months only. The only issue that Respondent's witness Mielechowski refuted was the assertion that there were conditions other than the deadline imposed upon the final offer. (Tr. 159, Mielechowski) As described above, Union Attorney and negotiator Eric LaRuffa testified that it was Coleman that set forth the terms of the final offer including the condition requiring the Union to prevent third

19

party boycotts and picketing. Although Coleman took the stand at the end of trial to refute a statement made by Jack Caffey, he never denied that Respondent's offer was for a four month agreement, and that the offer was conditioned on the Union guaranteeing that there would be no third party boycotts of the store. (Tr. 901)

In its position statement dated October 19, 2013, Respondent stated with regard to the final offer that, "in an attempt to reach an agreement, the Company offered a $.50 wage increase to wrap up the contract, provided the Union agreed to the rest of the Company's proposals, and accepted the proposal within the time limit set by the company. The Union failed to respond within this deadline." (GC-3B)

### iii. Respondent's Bargaining Notes and Position Statements Establish Its Violations

Not only did the testimony adduced at trial support the General Counsel's theories, but Respondent's own bargaining notes support the General Counsel's allegations that Respondent engaged in surface bargaining as well. With regard to union security and dues checkoff, Respondent's notes reflect the fact that it rejected union security and dues check off throughout the course of negotiations. (GC-17-27) Respondent's notes further demonstrate that the prevention of third party boycotts was always an issue for the Respondent, thus lending credibility to LaRuffa's testimony that Respondent conditioned the final offer on the cessation of third party boycotts. (GC-17, 19, 20, 21, 26, and 27) Respondent insisted on language that the Union would not, "assist or encourage the picketing or boycotting of the Employer by any outside entity during the lifetime of this agreement." (GC-27) Given the insistence on this language evident in its

own bargaining notes, Mielechowski's claim at trial that he did not condition the final offer on the cessation of third party boycott's lacks credibility.

With regard to the refusal to discuss economics, Respondent's bargaining notes state: "Article 5 [Wages] Golden Farm's position is that it is currently in no position to discuss in length at this point in negotiations because of the negative impact boycott, picketing….is having on business." (GC-25) In its own position statement, which labor consultant Mielechowski admitted at trial that he participated in writing, Respondent stated the following about economics: "Company rejected wage increases proposed by the Union. Company insists on freezing its current pay scale because of economic conditions and the threat of future picketing and hand-billing which in fact has materialized." (GC-3(B))

With regard to Respondent's refusal to allow access to Union representatives, Respondent's notes clearly show that it insisted on dealing with the shop steward only. In GC-19, Respondent proposed that in Article 18 Arbitration, the term "Union" be replaced with the term "steward." In GC-22, which Mielechowski testified bears attorney Tom Coleman's handwritten notes, Respondent in various provisions inserted the word "steward" where the provision called for discussions or meetings with the "Union." In his own notes, Mielechowski wrote, "Parties disagree on replacing 'union' with 'shop steward.' My position is this, Sonny will deal with the union within the parameters of the law but that is it. He would like to keep contact with the union at its minimum requirement." (GC-24)

### C. Respondent's Agent Steve Chun Threatens Employees

*i. Steven Chun's Agency Status*

21

Steve Chun has worked for Respondent for about eight years. (Tr. 876) Multiple employees testified that when they started they were told that Steve was a manager, and they continued to view him as such. (Tr. 344, 346 (Gonzalez), 368, 384 (Rios). No Respondent representative told them otherwise. Employee witnesses' corroborative testimony establishes that Steve has his own desk (Tr. 347 (Gonzalez), 370, 374 (Rios)), access to keys and security boxes, (Tr. 347 (Gonzalez), 371 (Rios)), and often gives employees work directives (Tr. 345 (Gonzalez), 370 (Rios), 394 (Martinez). Respondent conferred on Chun certain responsibilities that employees did not have, like paying for deliveries with checks and cash. (Tr. 393 (Martinez)) He was permitted to implement disciplinary policies (GC-34), and verbally reprimand and harass and even physically throw employees out of the store when they displeased him (Tr. 330 (Silva), 356 (Gonzalez), 401 (Martinez)). Chun has explicitly spoken for Kim in front of workers as well. For example, employee Gonzalez testified that after Steve Chun had fired him and Sonny Kim gave him his job back, Chun told him that "Sonny didn't care if I go back to work or not." (Tr. 357)

In fact, Respondent's own witness Joe Mielchowski testified that he knew that Chun "yelled at everybody and that he saw Steve yell at Sonny Kim twice." (Tr. 188) Notwithstanding this, Kim never put a stop to any of this activity or disciplined Chun. (Tr. 886, Chun) The only time that the owner ever restrained the supervisory power of Steve Chun in any way was when Kim reinstated employees that Chun decided to fire. (Tr. 331 (Silva), 356 (Gonzalez), 401 (Martinez)).

Aside from this evidence regarding the day to day conduct of agent Steve Chun, documentary evidence adduced at trial compels the conclusion that Chun is an agent of

Respondent. Three official New York State Notices of Inspection that have been posted in the store for public inspection are signed by Steve Chun and identify him as 'manager.' (GC- 36). If there was any doubt that employees had about Chun's managerial authority, this public document posted by the New York State Department of Agriculture and Markets erases that doubt.

### ii. Threats of futility

Chun went beyond implementing discipline on behalf of store management. He also made threats to union activists both in and out of the presence of store general manager Sonny Kim. In the presence of Sonny Kim, in December 2013, Chun yelled at produce employee Victor Hernandez Silva, telling Silva that he should "go home" because Sonny Kim would never sign a union contract." This statement was never disavowed by Mr. Kim, who was present through the entire altercation (Tr. 317-318.).

Union representative Eddie Diaz testified that in or around March 2013, he was standing outside Respondent's facility when he had a conversation with agent Chun in which Chun said that Diaz was wasting his time because "Sonny had already lined up private workers at the Unemployment [sic] to replace the five guys that [the Union] had there." (Tr. 433) Diaz also testified that in or around September 2013, while again standing outside the store, Chun told Diaz that Sonny Kim was never going to sign the contract. (Tr. 439) Chun did not refute this.

### iii. Threats of termination

Steve Chun was even more explicit about the fate of key Union supporters in conversations he had with employees like Jesus Consuelo Rios. While loading dairy

23

products inside the store's freezer in or around December 2013, Chun told Rios that once "the Union leaves," (the key Union supporters Victor, Martin, and Roberto) Respondent would give him more hours and more money. (Tr. 375). In August 2013, employee Martin Gonzalez overheard Steve Chun telling a delivery person outside the facility that "as soon as the problem stops, every worker is going to go home." (Tr. 355) By "problem" Chun was referring to the protestors outside of the facility. Id. Chun denied making any of these statements.

### iv. Instruction that employees should not talk to Union supporters

The evidence establishes that Respondent instructed new employees not to speak to the pro-Union workers. Both Martin Gonzalez and Roberto Ramirez Martinez — pro-Union workers—testified that new employees were instructed not to speak to them by Steve Chun because they were "not good people" and "faggots." (Tr. 354 (Gonzalez), 397 (Martinez). Produce employee Martinez testified that a new employee told Ramirez that he was taken aside by Steve Chun and that, "Steve told me that I couldn't talk to you, that you are bad people because you called the Union." (Tr. 397). Union representative Edwin Diaz testified that in March 2013, a new employee of Russian decent told him that management had stated that he could not talk to Diaz because he would be fired. (Tr. 433)

### v. Promise of benefits for signing the decertification petition

Finally, employee Roberto Ramirez Martinez recalled hearing manager Steve Chun talk about the decertification petition. Ramirez overheard Chun tell his coworkers, "You no talk to him [Ramirez] he's a bad guy. Talking lawyer, he's garbage. You get the

24

sign for my boss maybe next time, more money for you...that was for the petition, that if we sign for the petition to make the Union leave." (Tr. 399) It is unclear exactly when Martinez overheard this conversation. Martinez testified that he heard the statement "maybe, 15 to 20 days ago." (Tr. 398) However, the evidence showed that employees signed between August and October for the first petition, and between October and November for the second petition. (GC-30, GC-31) Thus, there is no question that this comment was made, however, it is unclear when Chun was actually soliciting signatures. Based on Ramirez' testimony, it appears that he likely made this promise in connection with the second petition.

### D. Respondent Unlawfully Withdraws Recognition From The Union

Beginning in or around August 28, 2013, shortly after Respondent refused to meet again with the Union and about one month prior to the expiration of the certification year, employees began circulating a decertification petition. At some point during the decertification effort,[15] Chun attempted to solicit signatures for the decertification petition and told employees that if they signed the petition, Respondent would give them more money. Other employees who circulated the petition repeated the claim that Respondent will give more money and increased hours to employees who signed the decertification petition.[16] Such conduct serves to taint the petition. Additionally, two signatures were duplicates and at least four signatures were collected on August 28, about a month prior to the expiration of the certification year. These signatures cannot be relied upon by Respondent to withdraw recognition because they were obtained prior to the end

---

[15] Again, it was unclear exactly when Chun solicited signatures

[16] Martinez testified about one and one half months ago (from January 30, 2014) he overheard employee Angelina tell coworkers that they would get more money and more hours for signing the petition. (Tr. 395)

of the certification year. Upon receiving the petition, Kim checked petition names against a self-prepared list of employees to determine how many employees signed. Respondent subsequently withdrew recognition from the Union on October 11, 2013.

With regard to the second petition, Kim testified that he was informed by attorney Coleman that the petition had to be done again. He stated that he then informed Bong Ki Hong that he had to circulate a new petition. (Tr. 540) Kim told Bong specifically that he had to make sure there was a heading at the top of each page. (Tr. 608-609) Bong admitted that Sonny told him that the attorney said that the petition had to be re-done and that Bong had to go around to obtain new signatures all over again. (Tr. 866) On November 21, 2013, attorney Coleman sent the Union another letter withdrawing recognition. (GC-16) Kim's active involvement in the second petition serves to invalidate the petition and make the second withdrawal of recognition unlawful.

The evidence establishes that both of Respondent's withdrawals of recognition from the Union were unlawful, based on three grounds. First, Respondent's unremedied unfair labor practices, including surface bargaining and numerous coercive threats to employees, tainted the decertification petition. Second, Respondent did not have objective proof that a majority of its employees did not support the Union, and third, the evidence establishes that Respondent unlawfully assisted in the decertification effort.

### 1. Respondent's Unfair Labor Practices Taint the Petition

As demonstrated above, both petitions were circulated at a time when there were numerous unfair labor practices committed at the facility, including surface bargaining and numerous coercive threats to employees. The first petition was circulated beginning

on or about August 28 and the second in November 2013. Interestingly, the first petition was circulated just one day after Respondent's negotiator Mielechowski had informed the Union that it had missed the deadline and refused to engage in further negotiations. (GC-14, GC-30) None of these unfair labor practices had been remedied prior to Respondent's withdrawal of recognition on October 11, 2013 and November 21, 2013. The unfair labor practices effected unit employees who testified at trial that they were "frustrated" with the progress of negotiations to the extent that they "saw no point" to the Union. As will later be discussed in more detail, these unfair labor practices taint the petition. *Master Slack Corp.* 271 NLRB 78, 84 (1984).

### *2. Respondent did not have objective proof that a majority of the workers no longer supported the Union at the time that Respondent withdrew recognition from the Union*

The evidence adduced at trial established that neither of the petitions provided Respondent with objective proof that a majority of the employees no longer supported the Union at the time that Kim instructed his lawyer to withdraw recognition from the Union. For each petition, Respondent checked names against a self-prepared list of employees to determine how many employees signed. However, Kim admitted that the self-prepared list was not an accurate reflection of how many employees were employed at that time. (Tr. 616, Kim) For example, while Respondent claims that Steve Chun is an employee and not a supervisor, his name did not appear on Kim's self-prepared list. Moreover, although Kim's list contained the names of Joon Chul Lee and Noh Park Soon, Respondent was unable to present any payroll evidence that these individuals worked for Respondent. (Tr. 587-588)

27

Moreover, at least 4 employees signed the petition on August 28, 2013, prior to the expiration of the certification year (GC-30).[17] In addition, at least two signatures are duplicates. (GC-30) When combined with the names of Joon Chul Lee and Noh Park Soon who do not appear on Respondent's payroll (and therefore do not appear to work for Respondent), the number of signers is potentially reduced by 8. As noted previously above, the number of potential employees may also be increased by at least 1 since Respondent admitted that employee Steve Chun was not placed on the list in R-15. Overall, the only thing that is clear about the decertification effort is that Respondent did not have an accurate account of the number of employees in the unit versus the number of signers and, therefore, could not have had objective proof that a majority of its employees no longer supported the Union at the time that it instructed its lawyer to withdraw recognition.

### 3.  *Respondent assisted in the decertification effort by soliciting signatures for the petition.*

Testimony adduced at trial establishes that manager/agent Steve Chun solicited signatures at some point during the decertification effort.[18] Employee Roberto Ramirez Martinez testified that manager Steve Chun talked about the petition. Ramirez overheard Chun tell his employees, "You no talk to him [Ramirez] he's a bad guy. Talking lawyer, he's garbage. You get the sign for my boss maybe next time, more money for you…that was for the petition, that if we sign for the petition to make the Union leave." (Tr. 399) In addition to this testimony regarding what Chun said, other witnesses testified to hearing

---

[17] Employee Jose Cuautle at one point in his testimony stated that the 8/28/13 date was a mistake. (Tr. 700) However, he later testified that the date was accurate. (Tr. 703) Cuautle was not a reliable witness. For example, although Respondent's attorney stated on the record that he had met Cuautle to dsicsus his testimony, Cuautle incredibly refused to admit to the meeting. Accordingly, Cuautle's assertion that the 8/28 dates were errors should not be credited as the document speaks for itself.

[18] As noted previously, Ramirez could not recall the exact date on which he heard Chun solicit signatures. He suggested that the solicitation occurred "maybe 15-20 days" ago. (Tr. 398)

similar statements from the other employees who were circulating the petition. Employee Roberto Ramirez testified that he overheard cashier Angelina tell workers that "the boss will find out…who's with him and who's not. And if you sign this, you will get more money and more hours." (Tr. 395) Martin Gonzalez testified that employee Jose Perez told him that he signed because Jose Cuautle told him that he would get more hours if he signed the petition. (Tr. 359) Employee Jesus Rios testified that his brother Javier signed the petition because he was afraid of getting fired. (Tr. 377)

With regard to the second petition, Sonny Kim freely admitted his extensive role in the decertification effort.  Kim testified that he was informed by attorney Coleman that the petition had to be done again. He admitted that he then informed employee Bong Ki Hong that he had to circulate a new petition. (Tr. 540) Kim admitted that he told Bong how the petition had to be done- that there had to be a heading at the top of each signature page. (Tr. 610) Kim testified that this time around, when Bong handed him the signed petitions, he sent the petitions in an email to his lawyer. (Tr. 613) Given how involved Kim admittedly was in the second petition, it is hard to credit his testimony that he played no role in the first.

### E. IRREPERABLE HARM TO UNIT EMPLOYEES

The evidence adduced at trial establishes that the Union has already lost significant support among Unit employees and is in real danger of losing its remaining support unless Respondent is ordered back to the bargaining table. Such a loss of support causes irreparable harm to the bargaining Unit because it directly affects the ability of the Union to negotiate a contract with the Respondent. Respondent has refused to recognize and bargain with the Union since October 2013. The collective bargaining relationship

has already been completely eviscerated in the eyes of the workers. Without an injunction, the Union will be hard-pressed to regain the support it lost to negotiate a fair contract.

The Union began holding meetings with Respondent's workers in or around October 2010. (Tr. 427, Diaz) About eight to ten Golden Farm employees were present. Id. The Union held regular monthly meetings through the election in May 2012. Approximately 10-13 workers would normally be present. (Tr. 428) In the past six months, however, only 5-7 workers attend Union meetings. (Tr. 430) Union organizers testified to the fact that new employees have been instructed not to speak to them. Organizer Eddie Diaz testified that in or around March 2013, a new employee who seemed to be of Russian descent, told Diaz that he could not talk to Diaz because Respondent told him he could be fired. (Tr. 432-433) Organizer Marcos Lopez testified that in or around August 2013, he had a conversation with employee Jose Cuautle wherein Cuautle stated that if new employees spoke to Lopez, they would be fired. (Tr. 414)[20]

Union organizer Edwin Diaz also testified that the progress of negotiations was discussed with workers at every meeting over the past six months. (Id.) In or around April 2013, Diaz recalled holding a Union meeting where employees expressed their frustration over the progress of negotiations. The employees said that the Union was

---

[20] There was some evidence presented that Cuautle was viewed by employees as a manager, however, Counsel for the General Counsel did not allege this individual to be a supervisor. With regard to the conversation, Lopez testified that organizer Eddie Diaz was also present for the conversation. (Tr. 413) In his testimony, Diaz was able to confirm that the conversation took place, but he could not recall the specific statements made. (Tr. 438) Given that Lopez was an otherwise credible witness, the mere fact that Diaz could not recall the specific statement made by Cuautle should not serve to discredit Lopez' version of the conversation. This is especially true given that Cuautle did not deny making this statement.

dragging, and that as these things between the Union and Respondent were going on, the employees were losing their numbers. They said that employees were being forced out one way or another. (Tr. 431) Union Director Jack Caffey testified that in or around March 2013, he recalled attending a meeting with the Golden Farm workers at a Burger King in Brooklyn. (Tr. 223) There were approximately 12 workers present. (Tr. 224) He testified that there was a lot of distrust among the workers towards the Union. The employees said that they were being harassed and that a lot of new workers were being hired. (Tr. 224) They also mentioned that manager Steve Chun continued to harass them, telling them that as soon after all this was done (meaning the Union matters), they were all going to be fired. (Tr. 227) Caffey testified that he also had to explain to the workers why the Union was encouraging NYCC and Occupy Kensington to stop boycotting. He testified that the employees wanted the boycotts to continue because they were afraid; they felt supported when the protestors were outside. (Tr. 227-228) The workers also stated that they were not happy that the negotiations were taking so long. (Tr. 228)

Similarly, employees testified that they were unhappy with the progress of negotiations and that they heard their coworkers assert their unhappiness as well. Respondent's witness Jimmy Hong testified that in conversations with coworkers about the Union, the workers told him that "there was no point" in the Union because they had not gotten wage increases, sick days, and overall because they hadn't seen the Union accomplish anything at the facility. (Tr. 739-740, Jimmy Hong) Employee Victor Silva testified that at the Union meeting held in March 2013 at a local Burger King, he told the Union that he was feeling desperate about the cutting of employee hours and about the fact "we were losing strength." (Tr. 308-309, Silva) Silva also testified that he felt

31

"frustrated having a manager like Steve and then having a boss that doesn't want to give

us a contract." (Tr. 311) Martin Gonzalez testified that with regard to the contract

negotiations, he "feels frustrated because we did it trying to get labor benefits, we didn't

do it thinking or hoping for other employees to leave the store." (Tr. 360, Gonzalez)

Gonzalez also stated that he told Caffey at Union meeting "if he could speed up the

negotiation process because some of the employees that voted for the Union were no

longer there." (Tr. 350)

## V. ARGUMENT

### A PRELIMINARY INJUNCTION SHOULD ISSUE TO RESTRAIN RESPONDENT AS THERE IS REASONABLE CAUSE TO BELIEVE THAT RESPONDENT COMMITTED UNFAIR LABOR PRACTICES

### A. The Statutory Scheme Under Which Injunctive Relief is Sought

Section 10(j) of the Act[21] authorizes United States District Courts to grant

temporary injunctions pending the Board's resolution of unfair labor practice

proceedings.  This provision reflects Congressional recognition that, because the Board's

administrative proceedings are often protracted, in many instances, absent interim relief,

a respondent can accomplish its unlawful objective before being placed under any legal

restraint, and thereby render a final Board order ineffectual. *See Kaynard v. Palby*

*Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517

F.2d 33, 38 (2d Cir. 1975) (*citing* S. Rep. No. 105 80th Cong, 1st Sess. at 8, 27 (1947),

*reprinted at* I Legislative History of the Labor Management Relations Act of 1947, 414,

---

[21] Section 10(j) [29 U.S.C. § 160(j)] provides:
    The Board shall have power, upon issuance of a complaint as provided in subsection (b), charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of such a petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

433 (Government Printing Office 1985)). Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g., Seeler*, 517 F.2d at 37-38.

In order to grant relief under Section 10(j) of the Act, the District Court in the Second Circuit must consider only two issues: (1) whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals"; and (2) whether granting temporary injunctive relief is "just and proper." *See Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995); *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir. 1984), and cases cited therein. As set forth below, both the "reasonable cause" and "just and proper" conditions are fully satisfied in the instant case.

### B.       The Reasonable Cause Standard

In order to obtain injunctive relief pursuant to Section 10(j) of the Act, the Board must first demonstrate that there is "reasonable cause" to believe that an unfair labor practice has been committed. In determining whether there is reasonable cause to believe that the Act has been violated, the district courts may not decide the merits of the case. *See Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals."

The reasonable cause requirement is satisfied where the Regional Director has come forward with evidence "sufficient to spell out a likelihood of violation." *Danielson*

*v. Joint Bd. of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d

Cir. 1974) (internal quotations omitted). Case law plainly establishes that Petitioner's

burden is minimal and requires only a very low threshold of proof. *Aguayo ex rel. NLRB*

*v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir. 1988). In meeting this low

threshold, Petitioner is not required to conclusively show that an unfair labor practice

occurred or that precedents governing the case are in perfect harmony. Instead, Petitioner

must only meet a lower burden of proof - that there is "reasonable cause" to believe that

an unfair labor practice has occurred. *J.R.L. Food Corp.*, 196 F.3d at 338; *Mego Corp.*,

633 F.2d at 1030; *Silverman v. Red & Tan Charters, Inc.*, 1993 WL 404146 (S.D.N.Y.

Oct. 6, 1993). Similarly, the Court "need not make a final determination that the conduct

in question is an unfair labor practice." *Major League Baseball*, 67 F.3d at 1059.

    In making a "reasonable cause" determination, the Court should give

"'appropriate deference' to the contentions of the NLRB, and should decline to grant

relief only if the [Regional Director's] legal or factual premises are 'fatally flawed.'"

*Major League Baseball*, 67 F.3d at 1059, *quoted in J.R.L. Food Corp.*, 196 F.3d at 335.

In that vein, the district court should not resolve contested factual issues. Conflicts in

evidence and credibility resolutions are to be resolved in favor of the Regional Director.

The Regional Director's version of the facts "should be given the benefit of the doubt,"

*Palby Lingerie*, 625 F.2d at 1051-52, n.5 (district court should not attempt to resolve the

credibility of witnesses); *Seeler*, 517 F.2d at 37, and, together with the inferences there

from, "should be sustained if within the range of rationality." *Mego Corp.*, 633 F.2d at

1031. *See also Gottfried V. Frankel*, 818 F.2d 485, 493-94 (6th Cir. 1987) (district court

is not permitted to resolve conflicts in the evidence; respondent's attack on credibility of

Board's witnesses merely establishes conflict in the evidence); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-51, n.2 (D. Mass. 1983), *aff'd. per curiam* 725 F.2d 664 (1st Cir. 1983).

Similarly, on questions of law, the district court "should be hospitable to the views of the Regional Director, however novel." *Danielson*, 494 F.2d at 1245, *quoted in Mego Corp.*, 633 F.2d at 1031. The court should sustain the Regional Director's legal conclusions unless it is convinced that view is wrong. *Palby Lingerie*, 625 F.2d at 1051; *Accord, Kaynard v. Independent Routemen's Association*, 479 F.2d 1070, 1072 (2d Cir. 1973) (district court committed reversible error by not limiting itself to reasonable cause question) [Section 10(l) proceeding, which requires essentially the same legal analysis. *See, e.g., Danielson*, 494 F.2d at 1242.]

## The Reasonable Cause Standard is Met

The litigation of the allegations in the administrative complaint has established substantial evidence to support the conclusion that Respondent violated Sections 8(a)(1) and (5) of the Act. In that regard, the evidence established that Respondent engaged in surface bargaining, in violation of Section 8(a)(5) of the Act, made unlawful coercive threats to its employees, in violation of Section 8(a)(1) of the Act, and unlawfully withdrew recognition from the Union, also in violation of Section 8(a)(5) of the Act.

### *A. Surface Bargaining*

Under Section 8(a)(5) of the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." Section 8(d)

of the Act defines the duty to bargain collectively as the mutual obligation of the employer and union "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement...." Although the duty of bargaining in good faith does not require that the parties make particular concessions, it envisions "a sincere, serious effort to adjust differences and to reach an acceptable common ground." *NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1187 (D.C.Cir.1981). Thus, an employer engages in bad faith or surface bargaining by conducting negotiations "as a kind of charade or sham, all the while intending to avoid reaching an agreement...." *Continental Ins. Co. v. NLRB,* 495 F.2d 44, 48 (2nd Cir.1974).

When determining whether an employer failed to bargain in good faith, courts of appeal examine "the employer's conduct in the totality of the circumstances in which the bargaining took place." *Id.* (citing *NLRB v. Billion Motors, Inc.,* 700 F.2d 454, 456 (8th Cir.1983)). In *Reichhold Chemicals, Inc.,* 288 NLRB 69 (1988) (*Reichhold II*), affd. in pertinent part sub nom. *Teamsters Local 515 v. NLRB,* 906 F.2d 719 (D.C. Cir. 1990), the Board reiterated some of the factors that it will consider in determining whether bad-faith bargaining had occurred. These include among others: unreasonable bargaining demands that are consistently and predictably unpalatable to the other party; unilateral changes in mandatory subjects of bargaining; and insistence to impasse on non-mandatory subjects of bargaining.

In *Bryant and Stratton,* 140 F. 3d at 183, supra, the Second Circuit recognized that the Board's determinations regarding bad faith bargaining are to be accorded deference under the law, citing, *N.L.R.B. v. Insurance Agents' Int'l Union,* 361 U.S. 477, 498, 80

S.Ct. 419, 432, 4 L.Ed.2d 454 (1960) ("Board has been afforded flexibility to determine

... whether a party's conduct at the bargaining table evidences a real desire to come into

agreement."), and *Glomac Plastics, Inc. v. N.L.R.B.*, 592 F.2d 94, 98 (2d Cir.1979)

(noting that the Board has particular expertise in making that determination, which this

Court "will not lightly disregard").

      In this case, Respondent's conduct during negotiations conclusively establishes

that it did not enter into negotiations with an open mind and with a good faith, sincere

intention of reaching an agreement.  In that regard, Respondent: (1) refused to bargain

over economics until the third-party boycott ended; (2) failed to present a wage proposal

until its final offer;  (3) took several intractable positions that would clearly be repugnant

to the Union;  (4) conditioned its final offer on permissive subjects, including obligating

the Union to prevent third-party boycotts;  and (5) having representatives at the

bargaining table who were not authorized to make or bind Respondent to its final offer.

### *1. Respondent Refused to Negotiate Economics Until the Union Convinced NYCC to Stop its Boycott – a Non Mandatory Subject of Bargaining*

      First, it must be noted that Respondent agreed to meet with the Union just once

per month and then for just 2–3 hours each session. Although Union representatives

asked the Respondent to stay later and even "bring pajamas," Respondent refused, opting

instead to begin each session at around noon and ending each session at round 2–3 pm so

the negotiators could travel back home. Respondent never denied this. Such conduct has

been found to be indicative of bad faith bargaining. See for example *Bryant & Stratton*

*Business Institute Inc., v. National Labor Relations Board*, 140 F.3d 169 (2nd Cir. 1998)(

the Second Circuit affirmed a Board order finding that the employer involved therein

engaged in surface bargaining, which included, among other things, agreeing to meet just once per month and ending sessions early to catch flights.)

It is settled law that an employer or a union which insists, as a condition for bargaining, upon a non-mandatory or permissive subject of bargaining violates Section 8(a)(5) or 8(b)(3) of the Act respectively. *N.L.R.B.* v. *Wooster Division of Borg-Warner Corporation,* 356 U.S. 342, 349-350 (1958). In *Allied Chemical and Alkali Workers of America, Local Union No.1 v. Pittsburgh Plate Glass,* 404 US 157 (1971), the Supreme Court considered whether an employer's decision to remove retirees from its insurance plan constituted a mandatory or permissive subject of bargaining. The Court first held that mandatory subjects of bargaining under the Act are generally limited to "issues that settle an aspect of the relationship between the employer and employees" within the bargaining unit, and it recognized that, generally, matters involving individuals who are not part of the bargaining unit fall outside this category and thus constitute permissive rather than mandatory subjects of bargaining. Id. at 178. The Court further recognized, however, that, in some circumstances, a third party concern would constitute a mandatory subject of bargaining, provided that the third party concern "vitally affects" the terms and conditions of employment of the bargaining-unit employees. Id. at 178-179. The Supreme Court in *Allied Chemical* held that the effect that bargaining on behalf of pensioners would have on the negotiation of active employees' retirement plans was too speculative a foundation on which to base an obligation to bargain. Thus, the employer's decision to remove the retirees from the insurance plan was a permissive subject of bargaining.

Boycotts by third parties do not settle any aspect of the relationship between employers and employees.[22] It cannot be credibly argued that boycotts by third parties "vitally affect" the terms and conditions of employment of the Unit employees involved herein. In fact, the Union has no control over boycotts by third parties. Therefore, when Respondent refused to discuss wages and other provisions because of the ongoing boycott of the store by NYCC and Occupy Kensington, it was conditioning bargaining, and an overall agreement, on a non-mandatory subject thereby violating 8(a)(5) of the Act. The fact that the Employer eventually made some proposals for paid time off at the June session, does not excuse the fact that since November 2012, it delayed negotiations by admittedly refusing to discuss any economics until the boycotts stopped. Furthermore, it is undisputed that Respondent made no offer on wages until its final offer in August. This compels the conclusion that Respondent engaged in this conduct purely to delay and prevent the parties from reaching agreement.

### ii. Respondent Did Not Make an Offer on Wages Until Its Final Offer

As noted earlier, Section 8(d) of the Act defines the duty to bargain collectively as the mutual obligation of the employer and union "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement...." Although the duty of bargaining in good faith does not require that the parties make particular concessions, it envisions "a sincere, serious effort to adjust differences and to reach an acceptable common ground."

---

[22] There was no evidence presented at trial that NYCC was in any way connected to the Union. Rather, Respondent submitted a lawsuit and a restraining order filed against NYCC only as part of its case. (R-10-12) Respondent never filed anything against the Union.

*NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1187 (D.C.Cir.1981). The Board and courts have found that an employer's failure to make a wage proposal during the course of negotiations can constitute evidence of bad faith. In *N.L.R.B. v. Wright Motors, Inc.,* 603 F.2d 604, 610 (7th Cir. 1979) the court found that the employer's avoidance of bargaining on key economic issues provided substantial support for the ALJ's conclusion of surface bargaining. In *Hydrotherm, Inc.*, 302 NLRB 990,1005 (1991), the ALJ, with Board approval, noted that where the employer had made no wage proposal despite the union having made two in three months, "No participant in collective bargaining, on either side of the table, ever expects that a contract can be concluded without agreement on wages and health insurance." The Board has also found bad faith bargaining where an employer engaged in a lengthy pattern of delaying tactics including the failure to make and economic proposal after a year of bargaining. *United Technologies*, 296 NLRB 571 (1989).

Here, the Respondent did not make an offer on wages until the August 23, 2013, bargaining session. The wage offer was included in Respondent's final offer. As in *Hydrotherm, Inc.*, supra the fact that Respondent waited more than eight months to give a wage offer and then conveyed the offer as part of its "take it or leave it" final offer, evidences bad faith. Up to that point, the Union had made numerous proposals with regard to wages and other economics, as seen in each of its bargaining proposals. Notwithstanding this, Respondent waited an inordinate amount of time to make its first and only wage proposal. Moreover, Respondent did not make any economic proposals at all until the June 3rd session - six months after the parties had started negotiating. This is further indicia of bad faith pursuant to *United Technologies,* supra.

### iii. Respondent's Took Several Intractable Positions that Would Predictably Be Repugnant to the Union

The Court in *N.L.R.B. v. F. Strauss & Son, Inc.*, 536 F.2d 60 (5th Cir. 1976) noted that "Section 8(d) of the Act requires an employer to meet and confer in good faith with union representatives; to refuse to do so is an unfair labor practice proscribed by s 8(a)(5). While this obligation does not require the parties to reach an agreement, it does require that they negotiate in a spirit of sincerity and cooperation in a genuine effort to find a basis of accord. *NLRB v. Big Three Industries, Inc.,* 497 F.2d 43 (5th Cir. 1974); *NLRB v. A. W. Thompson, Inc.*, 449 F.2d 1333, 1335 (5th Cir. 1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972); *United Packinghouse Food & Allied Workers Int'l Union v. NLRB,* 135 U.S.App.D.C. 111, 416 F.2d 1126 (1969), cert. denied, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). In evaluating the parties' good faith, the Board is not precluded from examining the substantive proposals put forth. Indeed, if the Board is not to be blinded by empty talk and by the mere surface notions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employers in the course of bargaining negotiations. *NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 134 (1st Cir. 1953), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). See also *A. H. Belo Corp. (WFAA-TV) v. NLRB*, 411 F.2d 959 (5th Cir. 1969); *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972)."

In evaluating proposals, the Board and courts will review their content, the timing that they are made, and the reasons given for the proposals at the bargaining table to determine whether they are made in good faith or evidence an intent to frustrate the bargaining process. For example, in *NLRB v. A-1 King Size Sandwiches, Inc.*, 732 F. 2d

872, 877 (1984), cert. denied 469 U.S. 1035 (1984), the Court enforced a Board order finding surface bargaining based on the positions that the respondent employer took during negotiations. The Court stated, "The Board correctly inferred bad faith from the Company's insistence on proposals that are so unusually harsh and unreasonable that they are predictably unworkable." The Court cited *NLRB v. Wright Motors, Inc.,* 603 F.2d 604, 609-610 (7th Cir. 1979), and *NLRB v. Johnson Mfg. of Lubbock,* 458 F.2d 453 (5th Cir. 1972), as precedent for its conclusion. Along these lines, the opposition to union security and dues checkoff based on philosophical grounds without business justification has been held to constitute evidence of bad-faith bargaining. See *Chester County Hospital,* 320 NLRB 604, 622 (1995), enfd. 116 F.3d 469 (3rd Cir. 1997); *CJC Holdings,* 320 NLRB 1041, 1047 (1996), affd. 110 F.3d 794 (5th Cir. 1997); *Hospitality Motor Inn,* 249 NLRB 1036, 1036 fn. 1; and *NLRB v. A-1 King Size Sandwiches, Inc.,* supra at 877.

The evidence establishes that in this case, Respondent made numerous proposals that were clearly impossible for the Union to accept. In addition, Respondent refused to negotiate over key issues. Finally, the evidence revealed that Respondent made a final offer conditioned on non-mandatory subjects of bargaining.

*1.     Proposal that the Employer Select the Shop Steward, Refusal to Discuss Union Access, and Insistence that Respondent Only Deal with the Shop Steward*

The Petitioner's witnesses testified that at the February 2013 bargaining session, Respondent proposed that Manager Sonny Kim be the individual to select the Union's shop steward. The Petitioner's witnesses also testified that Respondent repeatedly asserted that Sonny Kim did not want to deal with the Union at all, only with the shop steward. In fact, in labor consultant Mielechowski's notes, he stated that it was his

position as well that Respondent keep its contact with the Union to the "legal minimum." Respondent did not deny these allegations at trial. Such proposals are clearly so "unusually harsh and unreasonable that they are predictably unworkable." The selection of the shop steward is normally something within the purview of the Union and its members. The decision to run for the position of shop steward, and the service as steward, is protected by Section 7 of the Act. As such, an employer cannot interfere in this area. The fact that Respondent proposed selecting the shop steward, and then dealing exclusively with that person, is clearly evidence of bad faith.

With regard to the refusal to discuss Union access, Respondent admitted that it did not want Union officials at its store. Respondent asserted that it did not want the Union in the store because of what happened when the NYCC boycotters entered the store on a few occasions. However, as previously noted, Respondent presented no evidence that the Union had anything to do with the NYCC boycott. In fact, Respondent's documentation shows that Respondent's law suits were filed against NYCC only- not the Union. Thus, Respondent had no basis to refuse to allow the Union access. A Union is generally at a great disadvantage when it comes to access to an employer's employees as it must abide by the employer's property rights. However, as representative of the employees, a union presumes it will have access to the employees in order to discuss employees' working conditions in an attempt to better them. Without such access, employees are no better off than if they had no designated representative at all. This refusal to negotiate over Union access is further evidence of bad faith because it is so harsh and predictably unworkable.

### 2. _Refusal to Discuss Union Security and Payroll Deductions_

Union security provisions and the corresponding payroll deduction (or dues checkoff) provisions are common components of collective bargaining agreements that make it a requirement that new employees become members of the Union. These provisions are important to a Union's survival. The opposition to union security and dues checkoff based on philosophical grounds without business justification has been held to constitute evidence of bad-faith bargaining. See. _Chester County Hospital,_ 320 NLRB 604, 622 (1995), enfd. 116 F.3d 469 (3rd Cir. 1997); _CJC Holdings,_ 320 NLRB 1041, 1047 (1996), affd. 110 F.3d 794 (5th Cir. 1997); _Hospitality Motor Inn,_ 249 NLRB 1036, 1036 fn. 1 (1980) ; and _NLRB v. A-1 King Size Sandwiches, Inc.,_ supra at 877.

Respondent's witnesses offered the following inconsistent rationales for their refusal to negotiate over this provision: 1) Sonny Kim did not want to be responsible for all the paperwork, 2) Respondent knew employees did not support the Union, and 3) because of the ongoing boycotts. None of these reasons constitute legitimate business justifications for why the Respondent could not negotiate over a provision requiring membership in the Union. Union security clauses do not require any financial contributions by employers. The clause simply requires the payment of dues by the employees. Thus, this refusal is further evidence of bad faith.

### iv. _Respondent's Final Offer_

Respondent's final offer and subsequent refusal to meet and negotiate with the Union presents perhaps the most compelling evidence of bad faith.

44

First, notwithstanding the fact that Coleman and Mielechowski had been representing Respondent throughout negotiations, on August 23, 2013, they informed LaRuffa that they did not actually have Kim's authority to make the final offer, but they were making it anyway. "The degree of authority possessed by [a party's] negotiator is a factor which may be considered in determining good faith bargaining." *Wycoff Steel, 303 NLRB 517 (1991)*; *Lloyd A Fry Roofing Co., v. NLRB*, 216 F.2d 273, 275 (9th Cir., 1954). The fact that Respondent was making a final offer, the rejection of which would end negotiations, without actually having the authority to make it, evidences bad faith.

Next, Respondent did not deny that they were seeking only a four month contract. Insistence on a contract of unusually short duration can evidence bad faith bargaining. *NLRB v. Bagel Bakers Council of Greater New York*, 434 F.2d 884, 888 (2d Cir. 1970). . The Board has held that an employer's insistence on a collective-bargaining agreement which contains a short or otherwise unreasonable duration is indicia of bad faith only where there is no reasonable economic justification for such duration. *Cleveland Sales Co.*, 292 NLRB 1151, 1155-1156 (1989); *Deister Concentrator Co.*, 253 NLRB 358, 359 (1980); *Bagel Bakers Council of Greater New York*, 174 NLRB 622, 630 (1969); *Borg Warner Corp.*, 128 NLRB 1035, 1051 (1960). Respondent gave no explanation for why it wanted a four month contract. In fact, Respondent did not deny this allegation. Given that the average collective bargaining agreement is three years, this proposal for a four month contract is so severe that it constitutes evidence of bad faith.

Finally, Respondent's final offer was conditioned on two permissive subjects, 1) the guarantee of no future boycotts by third parties and 2) an arbitrary deadline of seventy-two hours. As discussed earlier, boycotting by third parties is a permissive

subject of bargaining. Similarly, the deadline Respondent imposed had no bearing on employee terms or conditions and Respondent offered no other explanation for the deadline other than stating that Tom Coleman was going away on vacation. (GC-14) A party cannot insist on permissive subjects as conditions to future bargaining or to a contract as a whole. (See e.g. *N.L.R.B.* v. *Wooster Division of Borg-Warner Corporation*, 356 U.S. 342, 349-350 (1958), *Allied Chemical and Alkali Workers of America, Local Union No.1 v. Pittsburgh Plate Glass*, 404 US 157 (1971).) Thus, Respondent's conditioning of the final offer on the Union's guarantee of no future boycotts by third parties and on an arbitrary deadline is further evidence of its bad faith. Although Respondent denied having conditioned the offer on the guarantee of no future boycotts, the individual who actually set forth the condition did not deny this allegation. Therefore, Respondent's denial should not be credited.

Respondent refused to put its offer in writing and refused to meet with the Union after it conveyed its final offer. Although Union attorney LaRuffa repeatedly asked for the offer in writing and presented additional bargaining dates, Respondent refused claiming that the fact that LaRuffa was asking for future meeting dates signified to it that the Union had rejected the final offer. Respondent admitted that it refused to put the offer in writing and that it rejected the Union's request for further negotiations. Respondent's conduct clearly demonstrates that it had no intention of continuing negotiations and that it wanted nothing more than the ability to claim that the Union had rejected the final offer. In that way, Respondent could then end the negotiations. This is exactly what it did. The Union did not reject the offer, he asked for it in writing. Respondent refused to put the offer in writing, most likely to avoid any chance that the Union would agree to it. Then

Respondent informed the Union that its arbitrarily imposed deadline had passed.
Respondent refused to meet with the Union again.

Respondent's conduct clearly shows that the final offer was not intended to be a
legitimate offer, but rather, a means by which the Respondent could claim rejection and
end the negotiations. The totality of Respondent's conduct at the table does not
demonstrate "a sincere, serious effort to adjust differences and to reach an acceptable
common ground." *NLRB v. Blevins Popcorn Co.,* 659 F.2d 1173, 1187 (D.C.Cir.1981).
Rather, the evidence revealed that Respondent conducted negotiations "as a kind of
charade or sham, all the while intending to avoid reaching an agreement...." *Continental
Ins. Co. v. NLRB,* 495 F.2d 44, 48 (2nd Cir.1974). Respondent did not claim that the
parties were at impasse. Thus, Respondent offered no legitimate explanation for its
refusal to negotiate after August 23rd.

### v. *Respondent's Denials Should Not Be Credited*

Although the District Court should not attempt to resolve the credibility of
witnesses per *Palby Lingerie,* 625 F.2d at 1051-52, n.5, supra, should the Court consider
the issue of credibility, the testimony of the Petitioner's witnesses should be credited.
With regard to the surface bargaining allegation, the only area where the General
Counsel's witnesses disagreed with the Respondent's, was in connection with the terms
of the final offer. As discussed earlier, Union attorney Eric LaRuffa testified that the final
offer consisted of a four month contract, a fifty cent raise for that four month period, and
two conditions: 1) that the Union agree that it would prevent any third party from
engaging in any boycott or picket against the store, and 2) that the Union agree to the

proposal by 11:59 pm the following Monday. LaRuffa testified that it was Coleman that conveyed the terms of the offer. Although witness Mielechowski denied that there were conditions other than the deadline placed on the final offer, he was not the one alleged to have made the offer. Thus, it was up to attorney Tom Coleman to deny setting forth the terms of the offer. Although Coleman did testify in order to deny another allegation, he never denied that the offer was for a four month contract, nor did he deny putting conditions on the final offer.

In *Roosevelt Memorial Medical Center*, 348 NLRB 1016, 1022 (2006) the Board noted that an ALJ may draw an adverse inference from a party's failure to call a witness who may reasonably be assumed to be favorably disposed to a party, and who could reasonably be expected to corroborate its version of events, particularly when the witness is the party's agent. Here, attorney Coleman testified and yet he completely ignored key allegations asserted against him leading to the inescapable conclusion that Respondent admits the allegation as set forth by LaRuffa. In any event, pursuant to *Roosevelt Memorial*, supra, if the failure to call a witness to testify about key events can lead to an adverse inference, certainly the failure of a called witness to address an allegation would also lead to an adverse inference. Either way, the allegations were never denied and thus, the General Counsel's witness should be credited when he asserted that the Respondent conditioned the final offer on the Union guaranteeing that there would be no third party boycotts or pickets- a permissive subject- and when the witness testified that the offer was for a four month contract only.

### *vi. Conclusion Regarding Surface Bargaining*

In *Bryant & Stratton Business Institute Inc., v. National Labor Relations Board,* 140 f.3d 169 (2nd Cir. 1998), the Second Circuit affirmed a Board order finding that the employer involved therein engaged in surface bargaining. The Board found, inter alia, that respondent Bryant "engaged in a calculated course of conduct designed 'to render contractual agreement an impossibility' and to 'erode support of the Union among employees.'" *Bryant & Stratton I,* 1996 WL 482931, at *67 (quoting *Smyth Mfg. Co.,* 247 N.L.R.B. 1139, 1167, 1980 WL 11150, at *50 (N.L.R.B. Feb. 19, 1980)) (alteration in original). The Board further found that "[e]fforts made by the Union to engage in meaningful discussions [were] at times met by [Bryant's] dilatory tactics attempting to thwart the finding of common grounds for agreement." *Id.* The conduct engaged in by respondent that provided the basis for this Board finding included agreeing to meet just once per month for negotiations, ending meetings early for reasons such as the need to catch a plane, failing to provide counterproposals in a timely manner, and making statements to the effect that the Union would have to convince it that a Union shop was necessary.

Based on all of the above, the Second Circuit concluded that: "... it is clear from the record that Bryant's focus was more 'on the prospect of a termination of its bargaining obligation through the Union's loss of the faculty members support than on the successful negotiation of a collective-bargaining agreement .... [and its] representatives frequently referred to the slim margin of the Union's majority and [Bryant's] belief that the Union lacked faculty support for its demands.'" *Bryant & Stratton* 140 F.3d 169, 184.

Just as in *Bryant,* Respondent's witnesses stated at trial that its employees did not support the Union because the vote had been close. In addition, Respondent herein only

agreed to meet with the Union once per month, ended sessions early to return home, and refused to bargain over a union security clause. Given the fact that Respondent stopped negotiating in August and ultimately withdrew recognition, the Respondent's focus here was also more "on the prospect of a termination of its bargaining obligation."

Consequently, as the Second Circuit in *Bryant & Stratton* upheld the Board's conclusion that the employer therein engaged in bad faith bargaining; heavily relying upon evidence that showed that the employer's goal was to drag out negotiations and avoid reaching agreement so as to promote employee dissatisfaction with the union. Reasonable cause clearly exists herein to believe that the Court of Appeals would uphold a Board finding that Respondent violated various Sections of the NLRA, including 8(a)(5).

### B. Respondent Violated Section 8(a)(1) Through its Agent Steve Chun

*i. Steve Chun's Agency Status*

Because of the powers and privileges granted to Steve Chun by Respondent, Respondent clearly held him out to employees as an agent of Respondent and Respondent's employees viewed him as such. This perception was also fully justified by the fact that Chun, on behalf of Respondent, signed NYS government inspection records as "Manager" for several years. These notices were posted at Respondent's facility. Chun's denial of his signatures and labeling as manager is not credible. The proper standard to classify Steve Chun as a Section 2(13) agent is not whether Sonny Kim ever explicitly named Chun as a management agent. Rather, the test is a based on the totality of Mr. Kim's action and inaction when Chun represented himself to third parties and the public as Respondent's manager.

50

The totality of the circumstances leaves no question that Respondent vested Steve Chun with, at the very least, *apparent authority* as a management agent. In considering questions of agency under the Act, the courts turn to section 2(13) of the Act, which provides as follows: "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13) (1994). The Board applies ordinary common law principles of agency in deciding issues of agency under section 2(13). *See International Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 212 (D.C.Cir.1995), *cert. denied*, 516 U.S. 1158, 116 S.Ct. 1040, 134 L.Ed.2d 188 (1996) ("the legislative history of that statute makes clear that it was designed to render 'both employers and labor organizations ... responsible for the acts of their agents in accordance with the ordinary common law rules of agency' ") (citations omitted); *Local 1814, Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1394, *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984) ("Beyond doubt, the legislative intent of this provision was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions."); *see also* H.R. CONF. REP. NO. 80-510 at 36 (1947), *reprinted in* 1947 U.S.C.C.A.N. 1135, 1142 ("[B]oth employers and labor organizations will be responsible for the acts of their agents in accordance with the ordinary common law rules of agency.").

Apparent authority results from a manifestation by a principal to a third person that another is his agent. Under this concept, an individual will be held responsible for acts of his agent when he knows or "should know" that his conduct in relation to the

agent is likely to cause third parties to believe that the agent has authority to act for him. (Rest. (3rd) of Agency, §27). As the Board has stated, "An agent has apparent authority to speak for a principal when the principal does something or permits the agent to do something, which reasonably leads another to believe that the agent had the authority he purported to have." *Cablevision Industries,* 283 NLRB 22, 29 (1987); see also *Massey Energy Co.*, 354 NLRB No. 83, slip op. 78 fn. 11 (2009). The ultimate test is whether, under all the circumstances, employees would reasonably believe that the purported agent spoke for and acted on behalf of company management. *Zimmerman Plumbing Co.*, 325 NLRB 106, 106 (1997); *Great American Products*, 312 NLRB 962, 962 (1993); *Dentech Corp.*, 294 NLRB 924, 925 (1989).

Here, the evidence adduced at trial establishes that Sonny Kim was aware that Chun disciplined employees up to and including termination, yet did nothing about it. Although the employees were given their jobs back, Kim did nothing to inform the workers that Chun did not have the power to discipline them. Moreover, Kim did not disavow Chun's threat of futility made to employee Silva; Kim was present when Chun made this threat and by not disavowing it, he confirmed in employees' minds that Chun was speaking on Kim's behalf. *Cablevision Industries,* 283 NLRB 22, 29 (1987). When combined with the NYS Notices of Inspection that stated that Steve was a manager, which were hung in the store for the public and employees to view, it becomes clear that Respondent had permitted Steve Chun to act as its agent and that Respondent knew that employees viewed him as such. Consequently, there is reasonable cause to believe that Respondent violated Section 8(a)(1) when Steve Chun made various threats to employees.

*ii. Respondent Threatened Employees that Supporting the Union was Futile*

Section 8(a)(1) of the NLRA prohibits an employer's interference with, or restraint or coercion of, the rights of employees to organize and join unions, bargain collectively, and engage in certain other "concerted activities." 29 U.S.C. §§ 157, 158(a)(1). "An employer's statement violates the NLRA if, considering the totality of the circumstances, the statement has a reasonable tendency to coerce or interfere with those rights," *Tasty Baking Co. v. NLRB,* 254 F.3d 114, 124 (D.C.Cir.2001). The prohibitions of Section 8(a)(1) include statements that tell employees selection of a bargaining representative would be futile. *See, e.g. In re Whirlpool Corp.,* 337 NLRB 726, 731 (2002) (citing *Trane Co.,* 137 NLRB 1506, 1962 WL 16789 (1962)).

Employee Victor Hernandez Silva testified that in December 2013, Steve Chun told him that Sonny would never sign a contract and that Silva should just "go home." This sentiment was reiterated to Union organizer Eddie Diaz when Chun told him in September that Sonny Kim was never going to sign a contract.[23] Such statements constitute unlawful threats of futility. See e.g. *Equipment Trucking Co.*, Inc., 336 NLRB 277, 283 (2001) (company unlawfully threatened futility when it told employees that the company would never negotiate a contract); *Outboard Marine Corp.*, 307 NLRB 1333, 1335 (1992) (same), enfd. mem. 9 F.3d 113 (7th Cir. 1993); *Airtex*, 308 NLRB 1135 fn.2 (1992) (employer unlawfully threatened futility by stating that it only had to negotiate with the union, not sign a contract). Thus, Respondent violated 8(a)(1) in making the above-described statement.

---

[23] Though not a separate violation, this statement serves to lend further credibility to the statement alleged by Silva.

iii. *Respondent Threatened Employees With Termination*

First, as noted above, Respondent told employee Silva that Sonny Kim would never sign

a contract and that Silva should just "go home." The Board has found that employer

statements that support for the Union and continued employment with the employer are

incompatible, are threats of termination. In *Heritage Nursing Homes*, 296 NLRB 230,

231, in finding the statement therein unlawful, the ALJ stated, "This type of language,

which is a request to quit if you support the Union, has been held to constitute a thinly

veiled threat to discharge. See *Rolligon Corp.*, 254 NLRB 22 (1981); *Steinerfilm, Inc.*,

255 NLRB 769 (1981), enfd. in relevant part 669 F.2d 845 (1st Cir. 1982); *Sans Souci*

*Restaurant*, 235 NLRB 604, 606 (1978)." Similarly, Chun's statement that employee

Silva should just "go home" because Kim was never going to sign a contract, is also an

unlawful threat of discharge as it is a request for the employee to quit because of his

support for the Union.

Secondly, in a statement made to employee Rios also in December 2013, Steve

Chun made it clear that "good employees" would be rewarded and that Union supporters

would be terminated as soon as the Union was ousted. Steve explicitly named three

Union supporters and told Jesus that they would be "gone". This is a clear threat of

termination and violation of Section 7 of the Act.

Finally, in August 2013, Martin Gonzalez heard Chun tell a delivery person that

once all of Respondent's problems were over, pointing to the protestors, all the

employees would be "sent home." By August 2013, the Union had set up its own picket

of the store. Thus, Chun was clearly referring to the Union and was clearly telling

workers that as soon as the Union problem was over they would all be fired because of it. Thus, Respondent violated 8(a)(1) by making these threats of termination.

*iv. Respondent Instructed Employees not to talk to Union Supporters*

There is no question that a supervisor's warning to an employee that the employee risks discharge if he persists in speaking to union representatives constitutes a violation of Section 8(a)(1). See *NLRB v. Promedica Health Systems, Inc.*, 206 Fed Appx 405 (5th Cir. 2006) (employers' warning to employee not to talk to other employees on the job about the union activities constituted an implied coercive threat); *P.S.K. Supermarkets, Inc.*, 349 NLRB 34, 36 (2007) (directive to employee "not to be seen speaking with anyone from the Union" is unlawful), citing *Airport 2000 Concessions, LLC*, 346 NLRB 958, 959 (2006) (supervisor's instruction to employee not to speak to union organizer is unlawful). Here, the corroborative testimony of employees Ramirez-Martinez and Gonzalez, and Union organizer Diaz establishes that Respondent told new employees they could not speak to pro-Union employees or Union representatives. Respondent presented no evidence to refute this testimony. Such instructions to employees are violative of the Act pursuant to the cases cited above. Thus, Respondent violated 8(a)(1) by instructing employees not to speak to Union supporters or representatives.

*v. Respondent's Denial of the Unlawful Statements Should Not Be Credited.*

Again, although the District Court should not attempt to resolve the credibility of witnesses per *Palby Lingerie*, 625 F.2d at 1051-52, n.5, supra, should the Court consider the issue of credibility, the testimony of Steve Chun should not be credited. Steve's

55

testimony was evasive, full of inconsistencies, and rife with incredible statements. For example, in response to the General Counsel's line of questioning about whether or not he was asked to sign the decertification petition, Chun testified that he did not talk about the Union because he did not need the Union or the manager because he was in the New Delhi Secret Service. (Tr. 884) This was just one example of Chun's evasiveness during questioning and overall unwillingness to answer questions in a direct manner. Chun also refused to admit that the signatures contained in GC-36 were all his. Chun admitted that his signature appeared on two of the three notices, but refused to admit that the third signature was his notwithstanding the fact that the Notice was posted at the facility in plain view. (Tr. 888-889) Rather, Chun implied that the NYS inspector forged his name and labeled him "manager" even though he told her that he was not the manager. Chun incredibly testified that the inspector refused to change his title and instead told him that he looked like a good worker and should be the manager anyway. (Tr. 892) Clearly, Chun's testimony is exaggerated and not worthy of belief.

In contrast, Petitioner's witnesses' testimony should be credited because they were all current employees of Respondent. It is well settled that the testimony of current employees that contradicts that of their supervisors is "particularly reliable because [the employees] are testifying adversely to their pecuniary interests." _Advocate South Suburban Hospital_, 346 NLRB 209, 209 fn. 1 (2006), quoting _Flexsteel Industries_, 316 NLRB 745 (1995), affd. mem. 83 F.3d 419 (5th Cir. 1996).

### C. Respondent Unlawfully Withdrew Recognition from the Union Twice

There is reasonable cause to believe that Respondent's withdrawal of recognition from the Union was unlawful because: a) Respondent's unfair labor practices tainted the decertification petitions under *Master Slack Corp.*, 271 NLRB 78 (1984), b) it did not have objective proof that a majority of employees did not support the Union, and c) Respondent unlawfully assisted in the decertification effort.

Absent unusual circumstances, an employer is obligated to recognize and bargain with a validly certified union for a reasonable period, ordinarily one year following certification, regardless of any changes in the majority status of the union. *Brooks v. N.L.R.B.*, 348 U.S. 96, 98-104, 75 S.Ct. 176, 178-82, 99 L.Ed. 125 (1954). The only unusual circumstances that have been recognized as changing this obligation are the dissolution of the certified union, radical fluctuation in the size of the unit within a short period, or the expiration of a collective bargaining agreement with a duration of less than one year. *Id.* at 103-04, 75 S.Ct. at 181-82. *See also Star Color Plate Serv.*, 843 F.2d at 1509. Accordingly, an employer may not withdraw recognition from a union prior to the expiration of the certification year. *Brooks*, 348 U.S. at 103, 75 S.Ct. at 181; *N.L.R.B. v. Accurate Web, Inc.*, 818 F.2d 273, 275 (2d Cir.1987). During the certification year, the union enjoys a conclusive presumption of majority support. This presumption promotes stability of the bargaining relationships enabling the union to concentrate on obtaining a collective bargaining agreement without worrying about the immediate risk of decertification, and removes any temptation on the employer's part to avoid good-faith bargaining in an effort to undermine union support. *See Auciello Iron Works, Inc. v. N.L.R.B.*, 517 U.S. 781, 785-87, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996).

After the certification year has expired, the presumption continues. However, there are circumstances where an employer may unilaterally withdraw recognition from a union. If an employer can show through objective evidence that the union has lost majority support by, for example, presenting a petition signed by a majority of employees in the bargaining unit stating that they no longer wish to be represented by the union, it may be able to withdraw recognition. *See Flying Food Grp., Inc. v. NLRB,* 471 F.3d 178, 182 (D.C.Cir.2006) (discussing *Levitz Furniture Co.,* 333 N.L.R.B. 717 (2001)). This privilege is not absolute.

In *SFO Good Nite Inn, LLC v NLRB,* 700 F.3d 1 (D.C. Cir. 2012), the DC Circuit recently discussed the Board's position on how an employer's unfair labor practices relate to a decertification petition. The court highlighted two cases, *Hearst Corp.,* 281 N.L.R.B. 764 (1986), and *Master Slack Corp.,* 271 NLRB 78 (1984). In *Hearst Corp.,* the Board found that the employer had unlawfully solicited employee signatures on union decertification petitions. The Board concluded: "Where an employer engages in such conduct, the decertification petitions will be found to have been tainted by the employer's unfair labor practices and the latter, consequently, will be precluded from relying on the tainted petition as a basis for questioning the union's continued majority status and withdrawing recognition from that labor organization." Id. The Board came to this conclusion notwithstanding testimony from 19 of the 56 unit employees that they were unaware of the employer's unlawful conduct.

In contrast, the Board in *Master Slack,* ruled that because the employer's unfair labor practices occurred a number of years prior to the submission of the decertification petition, the union had to show a causal relationship between the unfair labor practices

and the petition. The Board devised a four part test in that regard: "(1) [t]he length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency the unfair labor practices have to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union." *Master Slack Corp.*, 271 NLRB at  84.

In *SFO Good-Nite Inn,* the DC circuit determined that the NLRB acted rationally in applying the *Hearst* presumption of taint to invalidate a petition where evidence had been presented that the employer solicited employees' signatures to decertify the union. Thus, what the DC court confirmed was the fact that a decertification petition will be invalidated whenever there is a showing that an employer unlawfully propelled or instigated a decertification campaign. The court further confirmed that a decertification petition may also be invalidated where there is a showing that there is a causal relationship between the employer's unfair labor practices and the decertification petition.

In the instant case, the decertification petitions are invalid under both lines of precedent.

### *i. Respondent's unfair labor practices taint the petition.*

It is well established that an employer may not lawfully withdraw recognition from a union in the context of unremedied unfair labor practices of a nature likely to cause disaffection with the union among employees. *Master Slack Corp.*, 271 NLRB 78, 84

(1984). The Board has held that prior unremedied unfair labor practices "remove as a lawful basis for an employer's withdrawal of recognition the existence of a decertification petition . . . which, in other circumstances, might be considered as providing objective considerations demonstrating a free and voluntary choice on the part of employees to withdraw their support for the labor organization." *Pittsburgh & New England Trucking Co.*, 249 NLRB 833, 836 (1980). Still, the unfair labor practices must be of a character as to either affect the Union's status, cause employee disaffection, or improperly affect the bargaining relationship itself. *Master Slack*, supra citing *Guerdon Industries*, 218 NLRB 658, 659-661 (1975).

Surface bargaining is an unfair labor practice of a nature likely to cause disaffection from the Union. The act of surface bargaining results in a protracted course of negotiations which fails to produce a collective bargaining agreement. Without an agreement, employees will see no improvement to their terms and conditions of employment. Without improvements in terms and conditions of employment, employees are left to question the efficacy of the Union and the prudence of their decision to select the Union as their bargaining representative. The testimony adduced at trial revealed that employees were affected by the protracted negotiations caused by Respondent's surface bargaining. General Counsel witnesses as well as Respondent's witness Jimmy Hong, all testified to the fact that employees were unhappy with how long the negotiations were going on and the fact that the Union had not accomplished anything. In fact, Hong noted that employees had told him that there was "no point" to the Union while employee Martinez expressed how "frustrated" he was that his boss wouldn't agree to a contract. In addition, the fact that Respondent was informing employees that the owner would never

sign a contract and that employees would all be fired once the Union business was over, also caused disaffection among the workers. Employees testified that they kept losing coworkers that supported the Union and that they were afraid. Employees were so afraid of losing this jobs that they found comfort in the presence of the NYCC boycotters.

Thus, Respondent's withdrawal of recognition from the Union is unlawful because of the unremedied unfair labor practices in existence at the time of the withdrawal of recognition. This is not the only ground upon which the withdrawal is unlawful.

In the context of negotiations for a first contract, bad faith bargaining is particularly detrimental. Such unlawful misconduct unfairly deprives the Union of the benefit of the certification year, which it needs in order to demonstrate its usefulness to employees. See *Bryant and Stratton,* 140 F.3d at 184. (newly-certified union needs a "reasonable period of time for good faith bargaining".) See also *Viking Connectors, Co.,* 297 NLRB 95, 107-108 (1989) (withdrawal of recognition five days after certification year ended invalid where employer engaged in bad faith bargaining.)

### ii. Respondent did not have objective proof that employees did not support the Union at the time that it withdrew recognition.

In *Levitz Furniture Company of the Pacific,* 333 NLRB 717 (2001), the Board stated that "an employer may unilaterally withdraw recognition from an incumbent union only where the union has actually lost the support of the majority of the bargaining unit employees." It is the employer's burden to establish the actual loss of majority support at the time of the withdrawal of recognition, *HQM of Bayside, LLC,* 348 NLRB 758, 759 (2006), As the *Levitz* Board explained:

[A]n employer with objective evidence that the union has lost majority support—for example, a petition signed by a majority of the employees in the bargaining unit—withdraws recognition at its peril. If the union contests the withdrawal of recognition in an unfair labor practice proceeding, the employer will have to prove by a preponderance of the evidence that the union had, in fact, lost majority support *at the time the employer withdrew recognition.* If it fails to do so, it will not have rebutted the presumption of majority status, and the withdrawal of recognition will violate Section 8(a)(5).

Here, Respondent has failed to prove by a preponderance of the evidence that the Union in fact lost majority support. The testimony revealed that: a) Respondent did not know exactly how many workers were present at the time it withdrew recognition; and b) it is unclear exactly how many workers actually signed the petition. Respondent presented R-15 and R-16, which were copies of the list of employee prepared by Manager Sonny Kim. These lists were presented as if they accurately reflected the number of employees working in the Unit at the time of the withdrawals of recognition. However, Sonny Kim admitted that two of the petition signers did not appear anywhere in the wage statements that Kim asserted constituted the entirety of Respondent's payroll. No documentation was ever provided to support the claim that Joon Chul Lee and Park Noh Soon were on the Respondent's payroll at the time of the withdrawals.[24] Thus, Respondent has not proven that these two individuals were employees of Respondent at the time they signed the decertification petition. In addition, on cross examination, Sonny Kim admitted that employees were left off the list- most notably Steve Chun. When asked on cross if the lists in R-15 and 16 were complete lists of employees working at the

---

[24] Such a failure to provide documentation leads to the adverse inference that such documentation would not have supported Respondent's position. See *Cooke's Landing*, 289 NLRB 1100, fn. 8 (1988) (failure to produce documents led to inference that "such evidence would be harmful to its case"); *Granite Construction Co.*, 330 NLRB 205, 208 (1999) (error to credit testimony where party failed to provide documents on the same topic); *Made 4 Film, Inc.*, 337 NLRB 1152, 1159 (2002) (failure to produce corroborating document "significantly impacts" on the credibility of testimony)

time of the decertification effort, Kim said "no." Consequently, there is no way of

knowing whether there are other employees of Respondent that were left off the lists

contained in R-15 and R-16. Thus, it is impossible for Respondent to meet its burden as it

remains unclear exactly how many employees were in the unit at the time of the

withdrawals of recognition.

Moreover, the evidence adduced at trial revealed that the actual number of petition

signers may be as much as eight less than what appears on the petition. In that regard, at

least four employees signed the petition about one month prior to the expiration of the

certification year. The Board has strictly held that employers cannot rely upon

expressions of employee disaffection obtained during the certification year. See for e.g.

*Chelsea Industries*, 331 NLRB 1648 (2000), enfd. 285 F.3d 1073 (D.C. Cir. 2002). In

addition, two of the signatures on the petition are duplicates. Finally, when the signatures

of Joon Chul Lee and Park Noh Soon are taken off the list because their employment

status cannot be confirmed, as many as eight signatures could be invalid. Thus, not only

is it unclear exactly how many employees were in the Unit at the time of the withdrawals,

but it is equally unclear exactly how many employees signed the petitions.

### iii. Respondent lent more than "ministerial aid" to the decertification effort.

As noted earlier, if it is found that an employer unlawfully propelled or instigated a

decertification effort, the Board will presume that the petition is tainted. *Hearst Corp.*,

281 N.L.R.B. 764 (1986). Not all intervention by an employer is unlawful. An employer

is permitted to lend "ministerial aid" to employees during a decertification effort.

However, when an employer lends more than ministerial support, such conduct will be deemed to taint a resulting petition.

In *Times-Herald, Inc.*, 253 NLRB 524 (1980), the Board stated: "Indeed, the test is whether the Respondent's conduct constitutes more than ministerial aid." In *Corrections Corporation of America*, 347 NLRB 632, 633 (2006), it stated: "It is not determinative that an employer does not expressly advise employees to get rid of the union. Indeed, such direct appeals are not essential to establish that an employer solicited decertification." [citations omitted] In *Lee Lumber and Building Material Corp.*, 306 NLRB 408, 409 (1992), the Board stated: "It is clear that, under Section 8(c), an employer may lawfully furnish accurate information, especially in response to employees' questions, if it does so without making threats or promises of benefits." In *Armored Transport, Inc., 339 NLRB 374 (2003),* the Board stated:

> "The law is clear that an employer may not solicit its employees to circulate or sign decertification petitions and it may not threaten employees in order to secure their support for such petitions. An employer may not provide more than ministerial aid in the preparation or filing of the petition. The decision regarding decertification and the responsibility to prepare and file a decertification petition belongs solely to the employees. "Other than to provide general information about the process on the employees' unsolicited inquiry, an employer has no legitimate role in that activity, either to instigate or to facilitate it." *Harding Glass Co., 316 NLRB 985, 991 (1995)*, and cases cited therein.

The evidence adduced at trial showed that Respondent herein promised employees benefits for signing the decertification petitions and lent more than ministerial aid in both decertification efforts. First, the evidence revealed that manager/agent Steve Chun promised employees more money if they signed the decertification petition. Thus, regardless of whether he made the promise at the time of the first or the second petition, the evidence showed that at some point during the course of the decertification effort,

64

Chun promised workers benefits for signing the petition. Other employees circulating the petition made the same promises to employees, which, though not themselves unlawful, support the testimony and conclusion that Respondent was making promises to employees if they signed the petitions. Secondly, Manager Sonny Kim admitted that he specifically directed employee Bong Ki Hong to redo the petition and secure a new set of signatures. Kim admitted that he told Hong that the new set had to have a heading at the top of each page explaining the purpose of the petition. Clearly, the evidence showed that Respondent played a significant and direct role in the decertification effort that resulted in two withdrawals of recognition. Per *Hearst Corp.,* supra, the petitions would be tainted by Respondent's involvement in the decertification effort. Whether Chun solicited for the first or second petition is legally immaterial. See *SFO Good-Nite Inn,* 357 NLRB No. 16, (2011) (reaffirming "conclusive presumption that an employer's commission of unfair labor practices assisting, supporting, encouraging, or otherwise directly advancing an employee decertification effort taints a resulting petition" without specific proof of causation) *enforced* 700 F3d 1 (D.C. Cir. 2012)

Whether one relies on the unremedied unfair labor practices, Sonny Kim instigating or at least assisting in the decertification petitions, or the inability to show that a majority of workers no longer supported the Union, the testimony and evidence establishes that Respondent violated 8(a)(5) when it withdrew recognition both on October 11, 2013, and then again on November 21, 2013.

Based upon all of the above, it is evident that there exists reasonable cause to believe that Sections 8(a)(1) and (5) of the Act have been violated by Respondent. Ample testimonial and documentary evidence supports each allegation, some of the support

coming from Respondent's own bargaining notes and witnesses. Thus, the first prong of the 10(j) analysis is satisfied.

### D. Interim Relief Is Just and Proper

To obtain a Section 10(j) injunction, the Board must also show that the relief is "just and proper." *See MMIC, Inc.*, 734 F.2d at 953. The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress, through the Act, seeks to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980). In applying these principles, the Second Circuit has found 10(j) relief to be warranted where serious and pervasive unfair labor practices would threaten the effectiveness of the Board's final remedy. *Mego Corp.*, 633 F.2d at 1034. Similarly, the court has found Section 10(j) relief to be warranted where interim relief is the only effective means to preserve or restore the status quo as it existed prior to the commission of unfair labor practices, *Seeler*, *supra* at 38, or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under legal restraint. *Palby Lingerie*, *supra* at 1055.

### <u>The Just and Proper Standard is Met</u>

Section 10(j) relief is "just and proper" in this case to preserve the employees' Section 7 rights to freely choose whether to be represented by a labor organization, to protect the Union's status as the employees' certified bargaining representative, and to

prevent the final Board order in this case from being meaningless.[25] Interim relief is

needed to prevent irreparable harm. Respondent's continued disregard of the Union's

representational role will inevitably lead to further erosion of employee support for the

Union.[26]

Ample employee testimony was obtained establishing employees' frustration

with the unlawful delay in bargaining. Most notably, Respondent's own witness Jimmy

Hong testified to hearing employees complain about the fact that the Union had not

accomplished anything for the workers including wage increases and other paid time off

benefits. Respondent's conduct, including its bad faith bargaining and threats, has had a

demonstrative "chilling" effect on employees, as a number of employees eventually

signed the anti-Union petitions and new employees will not talk to the Union or pro-

Union employees. Moreover, Respondent's unlawful conduct, through Chun's threats and

statements, continued even after Respondent withdrew recognition, further chilling

employee support for the Union. The need for interim relief is accentuated where, as

here, a newly certified union is attempting to negotiate its first collective-bargaining

---

[25] *See Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369 (2d Cir. 2001) (10(j) relief necessary to prevent irreparable harm where successor employer refused to recognize and bargain with an incumbent union); *Dunbar v. Park Associates, Inc.*, 23 F. Supp.2d 212, 218 (N.D.N.Y. 1998), *affirmed* 166 F.3d 1200 (2d Cir.1998) (table) (bargaining order just and proper where employer's refusal to recognize incumbent union based on tainted employee disaffection); *D'Amico v. Townsend Culinary, Inc.*, 22 F.Supp.2d 480, 490–91 (D. Md. 1998) (bargaining order warranted against employer's withdrawal of recognition based on tainted petition caused by employer's prior bad faith bargaining).

[26] *See Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26-27 (1st Cir. 1986) ("[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. . .."), quoting *I.O.U.E. v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). *See also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 299 (the longer union "is kept ... from working on behalf of ... employees, the less likely it is to be able to organize and represent those employees effectively if an when the Board orders the company to commence bargaining").

agreement.  The courts have recognized that such unions are particularly vulnerable to employer misconduct and thus especially warrant protection under Section 10(j).[27]

Though the underlying trial has concluded, it may take months for the ALJ to issue his decision. Once rendered, the appeal process could take years to conclude. As the Second Circuit in *Hoffman v. Inn Credible Caterers LTD*, 247 F. 3d 360 at fn 4, pointed out, congress has always been concerned with the fact that "…Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the Act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation." Absent an interim bargaining order, and with the resulting loss of employee support, the Union will be unable to engage in effective collective-bargaining under a final Board order; the Board's order will be a nullity.[28] Further, absent interim recognition and bargaining, the unit employees will be deprived of the benefits of Union representation pending the Board's decision, a loss that includes non-economic benefits that a Board order in due course cannot remedy.[29] This loss of non-economic benefits of Union representation, such as advocacy by a Union representative, is significant even if employees' wages and benefits have remained largely unchanged.[30]

---

[27] *See, e.g., Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 501 (7th Cir. 2008), citing *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992); *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 879-80 (3d Cir. 1990).

[28] *See Moore-Duncan v. Horizon House*, 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001) (without employee support, a union has little leverage and "will be hard-pressed to secure improvements in wages and benefits at the bargaining table").

[29] *See, e.g., Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), affd. in rel. part, 610 F.2d 432, 43637 (6th Cir. 1979); *Bloedorn v. Francisco Foods*, 276 F.3d at 299.

Accordingly, there is a distinct likelihood that, by the time the Board issues its

final bargaining order, it may be too late to preserve employee choice and too late for the

Union to regain its lost support. *Frankl v. HTH Corp.*, 650 F.3d 1335, 1363 (9th Cir.

2011) ("even if the Board subsequently orders a bargaining remedy, the union is likely

weakened in the interim, and it will be difficult to recreate the original status quo with the

same relative position of the bargaining parties"); *Bloedorn v. Francisco Foods, Inc.*, 276

F.3d 270, 299 (7th Cir. 2001). Such delay would render the Board's ultimate final

bargaining order insignificant, where the impact of the unlawful conduct can no longer be

reversed. *See Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d

390, 396-97 (E.D. Pa. 2001) (in case where employer unlawfully withdrew recognition

from incumbent union, court granted interim bargaining order noting that without

employee support, union has little leverage and "will be hard-pressed to secure

improvements in wages and benefits at the bargaining table").

The balance of equities clearly favors granting interim relief, and Respondent

will suffer relatively little harm if injunctive relief is granted.[31] The costs in terms of

time and money spent on collective bargaining is a burden that falls on both parties and

---

[30] *Hoffman v. Inn Credible Caterers, LLC*, 247 F.3d at 369 n. 6 (loss of collective bargaining rights, such as union leaders and a grievance procedure, important even if employees have suffered "no material adverse consequences"). *See also Frankl v. HTH Corp.*, 650 F.3d at 1363 ("the Board generally does not order retroactive relief . . . to rank-and-file employees for the loss of economic benefits that might have been obtained had the employer bargained in good faith"); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 299 (final Board order "cannot fully compensate the employees . . . for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present").

[31] *See Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 164 (1st Cir. 1995) (union's potential loss of employee support and actual financial harm to employees "outweighs any harm which granting preliminary injunctive relief may cause the employer").

thus does not defeat a request for interim bargaining order relief.[32]  Moreover, an interim

bargaining order does not last forever[33] and it would not compel agreement to any

specific term or condition of employment advanced by the Union in negotiations.  Rather,

it only requires bargaining with the Union in good faith to an agreement or a bona fide

impasse.[34] Any agreement reached between the parties under a Section 10(j) decree can

contain a condition subsequent to take into account the possibility of the Board's ultimate

refusal to grant a final bargaining order remedy.[35]  Temporary interim relief in this case

also serves the public interest by ensuring that Respondent's unfair labor practices do not

succeed in flouting employees' rights and ignoring the Union's representational role.

Interim relief protects the employees' Section 7 rights, safeguards the parties' collective-

bargaining process, and preserves the remedial power of the Board.[36]

Lastly, contrary to Respondent's contention, the fact that the Region waited for

completion of the ALJ record does not undermine the need for injunctive relief.  There

has been no undue delay in this case.  The Region waited for the ALJ trial to test the

---

[32] *See Scott v. Stephen Dunn & Assocs.*, 241 F.3d 651, 669 (9th Cir. 2001).

[33] *See Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order... particularly an interim order which will last only until the final Board decision").

[34] *See Ahearn v. Remington Lodging and Hospitality*, 842 F.Supp.2d 1186, 1204-05 (D. Alaska 2012) (noting that an order to bargain in good faith imposes a "minimal" burden on an employer); *Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers*, 88 F. Supp. 935, 943 (D. D.C. 1950).

[35] *See, e.g., Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

[36] *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 300 ("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective-bargaining process' . . . [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices").

evidence Respondent would present regarding its withdrawals of recognition, including testing the reliability of its purported objective evidence of loss of support. The ALJ record now confirms Respondent's lack of objective evidence of loss of support, strengthens the Region's "reasonable cause" case, and will benefit the district court's evaluation of the case. Accordingly, it was appropriate to wait until after an ALJ hearing before seeking injunctive relief.[37] Moreover, the passage of time does not preclude injunctive relief.[38] Here, where the Union remains involved and employees are continuing to lose the benefits of representation, injunctive relief at this time can still prevent further harm to the Union's employee support and employee statutory rights and would be more effective relief than waiting for a Board order in due course.

## VI.        CONCLUSION

It is respectfully submitted that the evidence establishes that there is reasonable cause to believe that Respondent violated Section 8(a)(1) and (5) of the Act as alleged in the Petition and that the injunctive relief sought is "just and proper."

Dated at Brooklyn, New York, April 8, 2014.

---

[37] *See, e.g., Hirsch v. Konig*, 895 F.Supp. 688, 697-98 (D. N.J. 1995) ("the Board's caution before pursuing Section 10(j) relief was well-warranted to enable the administrative hearing process to unfold, which has resulted in creating a careful record of decision before the ALJ well beyond the ordinary complaint upon which 10(j) relief may be sought"). *See also Frankl v. HTH Corp.*, 650 F.3d at 1363 (noting the "benefit" of the ALJ record, which makes the district court's "task in evaluating the propriety of interim relief much easier").

[38] *See Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 361 (E.D.N.Y. 2012) (finding that a 14-month delay does not preclude injunctive relief because the Board "'does not take lightly the commencement of a § 10(j) action,' and it is acceptable for months to pass between the alleged unfair labor practices and the Regional Director's decision to commence a § 10(j) action"), quoting *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 954 (2d Cir. 1984).

Respectfully submitted,

Emily A. Cabrera

Naoki Fujita
Counsels for Petitioner
National Labor Relations Board, Region 29
Two MetroTech Center, Suite 5100
Brooklyn, New York 11201